WASTE MANAGEMENT, INC., on behalf of Waste Management, Inc. Boeing Company, Appellant, v. WISCONSIN SOLID WASTE RECYCLING AUTHORITY, and others, Respondents.

*No. 77–678. Argued June 6, 1978.—Decided June 30, 1978.*
(Also reported in 267 N.W.2d 659.)

For the appellant there were briefs by *Robert H. Friebert, Thomas W. St. John,* and *Friebert & Finerty* of Milwaukee, and oral argument by *Robert H. Friebert.*

For the respondents there was a brief by *L. C. Hammond, Michael J. Spector, Mary Pat Koesterer,* and *Quarles & Brady* of Milwaukee, and oral arugment by *Mr. Spector.*

SHIRLEY S. ABRAHAMSON, J. Waste Management, Inc., on behalf of the joint venture Waste Management, Inc.-Boeing Company (hereafter Waste Management) appeals from an order of the trial court dissolving a temporary restraining order and denying a motion for a temporary injunction. By the restraining order and temporary injunction Waste Management seeks to prevent the Wisconsin Solid Waste Recycling Authority

(hereafter Authority)[1] from executing a contract with Sadoff-Rudoy Industries, Inc. (hereafter Sadoff-Rudoy) for the design, construction and operation of a solid waste recycling facility in "Region I" of the state as defined by the Solid Waste Recycling Act, ch. 499, Stats. We affirm the order dissolving the temporary restraining order and denying the motion for a temporary injunction.

By its complaint in the underlying action, Waste Management seeks a judgment declaring that the subject matter of the proposed contract between the Authority and Sadoff-Rudoy is governed by the competitive bidding provision of ch. 499, Stats., as well as by competitive bidding procedures adopted by the Authority, and that the Authority is permanently enjoined from entering into any contract for the design, construction and operation of a waste recycling facility in Region I unless the contract is adopted in compliance with the competitive bidding provision of ch. 499, Stats., and the competitive bidding procedures adopted by the Authority.

I.

The trial court refused to grant the temporary injunction requested by Waste Management to restrain the Authority from executing the proposed contract with

[1] In 1973, in response to the recommendations of a task force which had been appointed by the governor to develop a plan for the reclaiming and recycling of solid waste in Wisconsin, the Wisconsin legislature enacted Chapter 499, Stats. (Ch. 305, Laws of 1973, effective June 19, 1974), which created the Authority, a public body charged with the responsibility of implementing a statewide solid waste recycling program. The Authority has been authorized to assist local units of government and the private solid waste management industry in providing systems, facilities, technology and services for solid waste management and resources recovery in specified recycling regions in the state. The constitutionality of the Authority was sustained in *Wisconsin Solid Waste Recycling Authority v. Earl*, 70 Wis.2d 464, 235 N.W.2d 648 (1975).

Sadoff-Rudoy pending a determination of the case on the merits. Statutory authority for the issuance of a temporary injunction is provided by sec. 813.02(1), Stats. (formerly sec. 268.02(1), Stats.), which provides:

"(1) When it appears from his pleading that a party is entitled to judgment and any part thereof consists in restraining some act, the commission or continuance of which during the litigation would injure him, or when during the litigation it shall appear that a party is doing or threatens or is about to do, or is procuring or suffering some act to be done in violation of the rights of another party and tending to render the judgment ineffectual, a temporary injunction may be granted to restrain such act."

The denial of a temporary injunction under this statute is a matter within the discretion of the trial court, and the sole issue on appeal is whether the trial court abused its discretion. The test is not whether this court would have granted the injunction in the first place, but whether there was an abuse of discretion on the part of the trial court. *Shearer v. Congdon,* 25 Wis. 2d 663, 666, 131 N.W.2d 377 (1964). As to the exercise of such discretion, this court has stated the following guidelines:

". . . Injunctions, whether temporary or permanent, are not to be issued lightly. The cause must be substantial. A temporary injunction is not to be issued unless the movant has shown a reasonable probability of ultimate success on the merits. Temporary injunctions are to be issued only when necessary to preserve the status quo. Injunctions are not to be issued without a showing of a lack of adequate remedy at law and irreparable harm, but at the temporary injunction stage the requirement of irreparable injury is met by a showing that, without it to preserve the status quo *pendente lite,* the permanent injunction sought would be rendered futile." *Werner v. A. L. Grootemaat & Sons, Inc.,* 80 Wis.2d 513, 519, 520, 259 N.W.2d 310 (1977) (notes omitted).

There is no assertion that the cause is not substantial, and the Authority does not contest Waste Management's assertion that without a temporary injunction to preserve the status quo, an ultimate judgment in Waste Management's favor might be ineffectual. This court has declined to find an abuse of discretion when a trial court refuses review by certiorari of the propriety of a contract award after the contract has already been let to another party. *Aqua-Tech v. Como Lake Protect. & Rehab. Dist.,* 71 Wis.2d 541, 552, 239 N.W.2d 25 (1976). "[T]he fact that the contract has actually been awarded to another is sufficient to induce the courts to decline to interfere to further complicate the matter, even though they might otherwise have done so." *State ex rel. Hron Brothers Co. v. Port Washington,* 265 Wis. 507, 509, 62 N.W.2d 1 (1953).

In addition, Waste Management is without adequate remedy at law to recover profits for loss of business opportunity. 10 McQuillin, *Municipal Corporations* (3d ed.), sec. 29.86, pp. 452–53; *Aqua-Tech v. Como Lake Protect. & Rehab. Dist., supra,* 71 Wis.2d at 553–54.

The question whether the trial court abused its discretion in denying the motion for a temporary injunction thus turns upon whether Waste Management has shown a reasonable probability of ultimate success on the merits. Waste Management argues that under this court's decision in *Aqua-Tech v. Como Lake Protect. & Rehab. Dist., supra,* a temporary injunction must issue whenever it appears that the opposing party threatens some act which violates the rights of another party and tends to render the judgment ineffectual, *whether or not* it also appears that the moving party will probably prevail on the merits. This contention is incorrect. It is neither logical nor equitable to require that no matter what the merits of the underlying complaint, a temporary injunction must issue. Our construction of sec. 268.02(1), Stats. in *Aqua-Tech* was premised on a

determination that the plaintiff had demonstrated a reasonable probability of ultimate success on the merits. 71 Wis.2d at 548. We reiterate our statement in *Werner v. A. L. Grootemaat & Sons, Inc., supra,* 80 Wis.2d at 521: " '[I]f it appears . . . that the plaintiff is not entitled to the permanent injunction which his complaint demands, the court ought not to give him the same relief temporarily.' " (Quoting *Vredenburg v. Safety Devices Corp.,* 270 Wis. 36, 39, 70 N.W.2d 226 (1955).)

Because the propriety of the trial court's denial of the motion for a temporary injunction cannot be determined absent a preliminary assessment of the merits of the underlying dispute, we must evaluate the legal arguments advanced by Waste Management to determine its "reasonable probability of ultimate success."

## II.

A basic dispute between the parties is whether ch. 499, Stats., requires the contract in issue to be let by competitive bidding.

The parties agree that the Authority did not follow competitive bidding procedures in deciding to award the Region I facility contract to Sadoff-Rudoy. The Authority argues that the proposed contract is a full service contract for the design, construction and operation of a recycling facility and that such a contract does not fall within the competitive bidding provisions contained in ch. 499, Stats. Waste Management argues that the contract is essentially a contract for the construction of a facility and the purchase of heavy solid waste processing equipment and is governed by competitive bidding requirements found in secs. 499.19 and 499.20(1), Stats.

The parties agree that the cost of constructing the Region I facility will exceed $25,000. Waste Management asserts that sec. 499.19, Stats., requires that con-

struction contracts valued at over $25,000 must be let by competitive bidding and that this proposed contract falls within this rule. Section 499.19 provides:

"499.19 Construction contracts. Any contract for construction valued at over $25,000 shall be let by the authority pursuant to the process of open or competitive bidding, provided, the authority may determine the format, contents and scope of any contract for construction of facilities of the authority, the conditions under which bidding shall take place and the schedule and stipulations for a contract award. The authority may select the contractor deemed to have submitted the lowest qualified bid, price and other factors considered, when, in the judgment of the authority, such award is in the best interests of the state. The authority may negotiate and enter into contracts with a single source for any of the professional services specified in s. 499.07(27) and required by or attendant to the development of facilities of the authority."

Both parties agree that a primary cost item of the proposed recycling facility will be its heavy solid waste processing equipment. Noting that under sec. 499.20(1), Stats., heavy solid waste processing equipment may be purchased "on a negotiated or open-bid basis" or may be purchased "as part of a construction contract," Waste Management argues that because such equipment is purchased in the case at bar as part of a construction contract, the purchase is subject to "the express command for competitive bidding" contemplated for all construction contracts by sec. 499.19, Stats. Sec. 499.20(1) provides:

"499.20 Contracting and purchasing procedures. (1) The authority may purchase, on a negotiated or open-bid basis, heavy solid waste processing equipment to be installed in facilities of the authority, or it may require such purchase and installation as part of a construction contract. The authority shall conduct its contracting and purchasing operations in accordance

with its regularly adopted and promulgated procurement policies and specific rules and procedures on purchasing and contracting approved by a two-thirds vote of its members. In procuring services with respect to the establishment, management and operation of transfer stations, and the transportation of solid wastes therefrom to a recycling facility, the authority shall insofar as is practicable give preference to firms based in this state."

Waste Management contends that the Authority is "attempting to smuggle a major construction contract into a package deal with a favored bidder" by claiming that if construction is combined with functions which are not themselves subject to competitive bidding requirements, the construction itself need not be competitively let. "Common sense would suggest that the result would be just the opposite," argues Waste Management. "That is, if functions subject to an optional competitive bidding requirement are combined with a function, like construction, which is subject to a fixed competitive bidding requirement, the effort to deal with a single source for all services would subject the entire program to competitive bidding."

We agree with the trial court's preliminary determination that the Region I contract is not within the contemplation of the competitive bidding provision contained in sec. 499.19, Stats. Our conclusion is based on a determination that the provisions of ch. 499 read as a whole authorize the Authority to negotiate long term, single-source contracts for the performance of its functions where negotiation (rather than competitive bidding) is made desirable by technological and management complexities, as well as on the established judicial principle that contracts for the performance of services requiring scientific knowledge and professional skill are outside the scope of competitive bidding statutes.

Statutory bidding requirements are designed to prevent fraud, collusion, favoritism and improvidence in the administration of public business, as well as to insure that the public receives the best work or supplies at the most reasonable price practicable. *Aqua-Tech v. Como Lake Protect. & Rehab. Dist., supra,* 71 Wis.2d at 550. However, such provisions are not to be extended beyond their reasonable purport. Statutory bidding provisions must be read in the light of the reason for their enactment, lest they be applied where they were not intended to operate and thus deny the authorities the ability to deal with problems in a sensible, practical way.

The requirement set forth in the first sentence of sec. 499.19, Stats., that construction contracts be let by competitive bidding, must be read in the context of the section as a whole and in conjunction with the other provisions of ch. 499.

The last sentence of sec. 499.19, Stats., gives the Authority specific permission to *negotiate* with a single source for any of the professional services specified in sec. 499.07(27), Stats. Section 499.07(27) confers upon the Authority all powers necessary or convenient:

" . . .

"(27) To contract for services in the performance of architectural and engineering design, the supervision of design and construction, system management and facility management; *and for such other professional or technical services as may require either prequalification of a contractor or the submission by any person of a proposal in reponse to an official request for proposal or similar written communication of the authority,* whenever such services are, in the discretion of the authority, deemed necessary, desirable or convenient in carrying out the purpose of the authority. [Emphasis added]."

The record before us indicates that the Authority properly exercised its discretion in concluding that the pro-

fessional and technical services necessary to the design, construction and operation of the Region I facility were such as to require the submission of proposals rather than competitive bids. The Authority was advised by its consulting engineers that the technology of solid waste recovery is in an infant stage and that consequently it was not in the public interest for the Authority to attempt to develop detailed plans and specifications for any one method of recycling facility operation.

Section 499.20(2), Stats., explicitly authorizes the Authority to negotiate long term, single-source contracts for the performance of its functions when, in its discretion, the Authority determines that a negotiated rather than a competitively bid contract would best serve the public interest. Section 499.20(2), states:

"(2) The authority may enter into long-term contracts with private persons for the performance of any such functions of the authority which, in the opinion of the authority, can desirably and conveniently be carried out by a private person under contract provided any such contract shall contain such terms and conditions as will enable the authority to retain overall supervision and control of the business, design, operating, management, transportation, marketing, planning and research and development functions to be carried out or to be performed by such private persons pursuant to such contract. *Such contracts may be entered into either on a negotiated or an open-bid basis, and the authority in its discretion may select the type of contract it deems most prudent to utilize, considering the scope of work, the management complexities associated therewith, the extent of current and future technological development requirements and the best interests of the state.*" [Emphasis added.]

The record before us indicates that the Authority determined, in its discretion and upon the advice of its consulting engineers, to negotiate a full service design, operation and construction contract for the Region I facility because, *inter alia*, the components of a recycl-

ing facility process line system are so interrelated that the ultimate nature of the system must result from professional expertise and educated judgment, and because the Authority wanted to be able to hold one entity accountable for the successful operation of the Region I facility.

Section 499.55, Stats., provides that "[ch. 499] is necessary for the welfare of this state and its inhabitants; therefore, it shall be liberally construed to effect its purpose." Among the purposes of ch. 499, according to sec. 499.03(7), is provision for the "planning, research and development, and appropriate innovation in the design, management and operation of systems and facilities for solid waste management, in order to permit continuing improvement and provide adequate incentives and processes for lowering operating and other costs."

The question is whether the Authority can promote "appropriate innovation in the design, management and operation of systems and facilities for solid waste management" if it is bound by sec. 499.19, Stats., to submit all proposals for the design, construction, and operation of a facility as the one involved here to competitive bidding procedures. Competitive bidding requires "full, clear, definite [and] precise" specifications, for there must be a common standard by which to permit the comparison of bids. 1A Antieau, *Municipal Corporation Law* sec. 10.31, p. 764 (1973). The precise specifications necessary to competitive bidding of necessity may preclude innovation by the "bidders."

This court has recognized exceptions to competitive bid requirements. There are circumstances where it is impossible or impracticable to draw specifications satisfactorily to permit competitive bidding. *Aqua-Tech v. Como Lake Protect. & Rehab. Dist., supra,* 71 Wis.2d at 547; *Flottum v. Cumberland,* 234 Wis. 654, 662–63,

291 N.W. 777 (1940) ; Antieau, *supra,* sec. 10.28 at 759. Contracts for the performance of services requiring scientific knowledge and professional skill do not call for the performance of work which must be submitted to competitive bidding. The rationale is that the legislature must have intended to leave public bodies free to judge the professional qualifications of those who perform services requiring scientific knowledge and professional skill. *Aqua-Tech v. Como Lake Protect. & Rehab. Dist., supra,* 71 Wis.2d at 546.

The record before us indicates that the Authority asked potential proposers to advise the Authority as to the best system for dealing with the Region I waste stream, keeping in mind the desired result, because the infant state of the art of solid waste recycling requires the innovation and professional and technical judgment which make precise specifications impossible or impracticable. The record contains the affidavit of Mr. Harvey Funk, Assistant Vice President and Manager of the Energy Division of a firm of consulting engineers which advises the Authority, as well as recycling projects in seven other states. Funk states that it is his professional opinion that under a full service (design, construction and operation) approach to the Region I facility, it is neither practical nor possible for the Authority to specify with the particularity necessary to a competitive bidding procedure the details of any one processing line design, method of recycling facility operation or specific pieces of equipment.

Waste Management asserts that a trial will clearly establish that performance of the Region I contract does not require a skill and expertise which would warrant exemption from competitive bidding requirements. However, on the basis of the record before it, the trial court concluded that Waste Management failed to demonstrate that it would probably succeed in proving this

assertion. We cannot conclude that the trial court abused its discretion in making this determination.

Waste Management also asserts that if scientific knowledge and professional skill are required for the operation of waste recycling facilities, the proposed contract with Sadoff-Rudoy does not fall within the "scientific knowledge and professional skill" principle, because Sadoff-Rudoy did not itself design the recycling plant it proposed to offer. The principle applies, argues Waste Management, not to "a broker of another's services" but only to the "actual provider of the services." We do not agree with this contention. So long as the contract encompasses "scientific knowledge and professional skill," the services may be made available through the original source or through a "broker."

It is not our intention to read the competitive bidding provision out of sec. 499.19, Stats., or to allow the avoidance or evasion of the requirements of sec. 499.19 where applicable. Our holding here is narrow: The trial court did not abuse its discretion in concluding that Waste Management failed to demonstrate to a reasonable probability that the Authority was not authorized to use a proposal-negotiation procedure for the letting of the particular contract here in issue pursuant to sec. 499.07 (27) (as incorporated by sec. 499.19), sec. 499.20 (2), and sec. 499.03 (7), as well as the "scientific knowledge and professional skill" exception to competitive bidding requirements.

### III.

Waste Management argues that even if the Region I contract is not subject to competitive bidding requirements under ch. 499, Stats., the Authority should not be allowed to execute the proposed contract with Sadoff-

Rudoy because the Authority failed to comply with that part of sec. 499.20 (1) which provides:

". . . The authority shall conduct its contracting and purchasing operations in accordance with its regularly adopted and promulgated procurement policies and specific rules and procedures on purchasing and contracting approved by a two-thirds vote of its members. . . ."

According to Waste Management, the only rule formally enacted by the Authority with respect to the Region I recycling facility is an April 25, 1975 resolution calling for competitive bidding for "services for Region I."[2] Waste Management argues that the Authority did not proceed pursuant to the competitive bidding requirements of this resolution and that the proposed contract with Sadoff-Rudoy therefore contravenes sec. 499.20 (1).

The Authority contends that the April 25, 1975, resolution, passed before the Authority had been advised by its consulting engineers that competitive bidding would be neither possible nor practical for the Region I contract, was made obsolete when by unanimous vote the Authority adopted the lengthy "Request for Proposal" booklet (hereafter RFP) by which it solicited proposals[3] for the design, construction and operation of

---

[2] The April 25, 1975 resolution provided:

"(1) Services for Region I shall be offered by competitive bids based on a specified quantity and composition of waste as we estimate them by percentage and by seasons, with appropriate escalation clauses; (2) bids shall be on the basis of construction, operation, and maintenance of recycling centers on a cost per ton figure; (3) various streams shall be bid on by various users in a manner so that bids are comparable, including escalation clauses; (4) the Authority shall use the complete bidding procedure before exercising its right to negotiate contracts."

[3] The Authority icontends in its brief that the RFP did not solicit *bids;* it requested the submission of *proposals.* Waste Management contends that "bids" were solicited. The terms, although symbolic of the parties' contentions, are not controlling. It is clear that at times the Authority used the word bid and other times

the Region I facility. The Authority asserts that the RFP and an advertisement for the RFP (also adopted by unanimous vote) themselves constitute the Authority's rules for awarding the Region I contract. We agree with the Authority's contention.

Sec. 499.20 (1) does not prescribe "formal" adoption for the Authority's purchasing and contracting rules and procedures; it merely requires that these rules and procedures be approved, as were the RFP and the Advertisement, by a two-thirds vote of the Authority's members. Moreover, given the broad range of projects the Authority may properly initiate, sec. 499.20 (1) should not be read to restrict the Authority's ability to tailor its rules and procedures to the particular needs of specific projects. So long as the Authority adopts, by a two-thirds vote of its members, proposal solicitations which accurately inform potential proposers of the procedures to be followed in awarding particular contracts, and so long as these procedures are permissible under ch. 499, Stats., the solicitations themselves may be considered the "specific rules and procedures" referred to in sec. 499.20 (1).

Waste Management contends that even if the RFP and the Advertisement did supercede the April 25, 1975 resolution, these documents, like the April 1975 resolution, evidenced the Authority's intent to award the Region I contract pursuant to competitive bidding rather than proposal-negotiation procedures. Moreover, claims Waste Management, the Authority did in fact follow competitive bidding procedures up to the time that the bids were opened.

The Authority contends that the RFP announced and the Authority followed a proposal-negotiation procedure. Alternatively, the Authority argues that so long as a

proposal. In light of our decision in the case at bar, the opinion will use the term "bid" only when referring to contentions made by Waste Management.

proposal-negotiation procedure is authorized by statute, an award can be made pursuant to that procedure even if the awarding authority announced and initially followed competitive bidding procedures. To the extent that *Menzl v. Milwaukee,* 32 Wis.2d 266, 145 N.W.2d 198 (1966) and *Akia v. Kewaskum Community Schools,* 64 Wis.2d 154, 218 N.W.2d 494 (1974) can be interpreted to support the Authority's alternative argument, this interpretation is disavowed. The clear import of sec. 499.20 (1), together with basic concepts of fair administrative procedures,[4] requires that the Authority award its contract in accordance with the rules and procedures it sets forth. *Cf. Griswold v. Ramsey County,* 242 Minn. 529, 65 N.W.2d 647, 652 (1954).

Although there is ambiguity both in the Authority's announced and actual procedures, the record before us, read as a whole, supports the trial court's conclusion that the Authority announced and followed a proposal-negotiation procedure for the award of the Region I contract.

The Introduction to the RFP states the Authority's intention "to invite full service proposals for the design,

[4] *Cf.* "An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down." *United States v. Heffner,* 420 F.2d 809, 811 (4th Cir. 1969) ; Such deviations "cannot be reconciled with the fundamental principle that ours is a government of laws, not men." *Hammond v. Lenfest,* 398 F.2d 705, 715 (2d Cir. 1968) ; *Service v. Dulles,* 354 U.S. 363, 372 (1957) ; *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954) ; *Borough of Lansdale, Pennsylvania v. The Federal Power Commission,* 494 F.2d 1104, 1113 (D.C. Cir. 1974) ; *United States ex rel. Checkman v. Laird,* 469 F.2d 773 (2d Cir. 1972) ; *United States v. Leahey,* 434 F.2d 7 (1st Cir. 1970) ; *Ricker v. United States,* 396 F.2d 454 (Ct. Cl. 1968) ; *Bonita, Inc. v. Wirtz,* 369 F.2d 208, 212 (D.C. Cir. 1966) ; *Sangamon Valley Television Corp. v. United States,* 269 F.2d 221 (D.C. Cir. 1959) ; Note, *Violations by Agencies of Their Own Regulations,* 87 Harv. L. Rev. 629 (1974).

construction and operation of its Region I Solid Waste Recycling Plant." The RFP also notes, in what appears to be traditional "bid" language, that "[s]ealed proposals will be received by the Authority until 10:00 a.m., Central Daylight Time, August 9, 1977. At that time and promptly thereafter, all proposals that have been duly received will be publicly opened and read."[5]

The body of the RFP contains, among other items, general descriptions of the Authority, the Region I system, the manner in which proposals should be submitted, and the procedures to be followed by the Authority in evaluating the proposals and in negotiating a final contract. Appendix B to the RFP contains the Authority's general design for a recycling system.

Included in the section of the RFP which generally describes the Region I system is the following statement:

"The Authority prefers to receive proposals on its system (Appendix B), but realizes the proposers may wish to offer a modification thereof, or a substantially different recycling system."

This invitation for the submission of modified and innovative recycling system proposals is contraindicative of an intent to let the Region I contract competitively.

According to an affidavit made by Arloe W. Paul, Chairman of the Authority, in opposition to Waste Management's motion for a temporary injunction, "representatives of the Authority at a meeting of proposers in June, 1977, encouraged all proposers to include in their proposals innovative recycling design and construction processes." Paul's affidavit also stated that each of the six submitted plans proposed a recycling system which differed in some significant respect from the general concept and design of the system suggested by the Authority.

---

[5] The proposals were in fact read on September 7, 1977.

The section of the RFP which describes the procedures to be followed by the Authority in evaluating the proposals and in negotiating a final contract is divided into two parts. The first part, which describes the proposal evaluation process includes, among others, the following provisions. Each proposer is to meet with the Authority to summarize its proposal. Proposers are to refrain from contacting the Authority after the initial meeting. "Contact shall be initiated if necessary only by the Authority for the purpose of clarifying proposals." The Authority, during the evaluation process, may reject any or all proposals; waive irregularities in any proposal; and *negotiate with proposers after receipt of proposals*. A provision which permits the Authority to negotiate with proposers as part of the proposal evaluation process, as opposed to the contract negotiation process, cannot be read to indicate adherence to competitive bidding procedures.

The proposal evaluation section also lists, in order of importance, the principal criteria to be used in evaluating the proposals:

1. Operating costs including cost to be charged the Authority per ton for processing.
2. Total capital cost.
3. Proven system reliability and experience.
4. Recovery efficiency.
5. Environmental compatibility.
6. Expansion flexibility.
7. Adaptability to new technology.
8. Technical feasibility.
9. Operator's financial strength.
10. Operator's experience and management capability.

These evaluation criteria appear to presuppose the exercise of a wide-ranging series of subjective judgments.

The section of the RFP which describes the contract negotiation process (which occurs after the proposals are evaluated) states:

"After evaluation of proposals, the Authority will determine a priority list of finalists not to exceed five and commence sequential negotiations on any aspects deemed appropriate by the Authority with the first preferred proposer for a 20-year contract to design, build and operate the Plant. If the Authority does not reach agreement with the first preferred proposer within 45 calendar days, or if negotiations have reached an impasse in the opinion of the Authority prior thereto, it may begin negotiations with the second preferred proposer, and continue such negotiation schedule with subsequent finalists on the same basis until either a contract is negotiated or there are no other finalists with which to negotiate. . . ."

Waste Management claims that it should have been first on the "priority list of finalists" because it submitted the lowest responsible *initial* bid.[6] However, as the proposal evaluation section of the RFP clearly indicates, the proposer with the lowest initial proposal is not assured *any* position on the priority list of finalists. The evaluation criteria list price as an important but not the dispositive factor. Moreover, because the Authority specifically reserved the right to meet with the proposers to clarify the proposals and to negotiate with proposers as part of the proposal evaluation process before the finalists were selected, the fact that a proposal was initially low may be of relatively little ultimate significance.

It would have been wiser had the Authority specifically stated in the RFP that "the contract for the design, construction and operation of the Region I facility will be awarded pursuant to proposal-negotiation rather than competitive bidding procedures." Nonetheless, read as a whole, the RFP supports the trial court's conclusion that the Authority established proposal-negotiation procedures for award of the Region I contract.

---

[6] The Authority disputes Waste Management's claim that Waste Management's was the lowest initial proposal.

Further, the record indicates that the Authority's actual procedures substantially conformed to its announced procedure.

As has been noted, representatives of the Authority, at a meeting of proposers held in June 1977, encouraged all proposers to include in their proposals innovative recycling design and construction processes. The six proposals submitted in response to the RFP were opened at a meeting of the Authority held on September 7, 1977. The minutes of that meeting state that before reading the six submitted proposals, the Authority's Executive Director announced to the proposers that the Authority reserves "the right to accept or reject any or all proposals and that the Authority may or may not accept the low bid as it deems best."

On September 8 and 9, 1977, the Authority's proposal evaluation committee met to start evaluating the proposals. According to the evaluation committee's report, "in depth analysis was begun and specific tasks assigned to each of the team members to investigate flow lines, major equipment, traffic flow, and finance experience, etc." At its September 15 and 16 meetings, the evaluation committee decided to send letters to all proposers still under consideration, asking specific clarifying questions. While some of the same questions appeared in all of the letters, no two of the letters were identical. Between September 26 and October 11, 1977, the evaluation committee visited recycling plants throughout the country to evaluate equipment and discuss operations. According to the evaluation committee's report, "[n]umerous additional contacts have been made with the proposers over this same period in order to clarify parts in various proposals."

On October 17, 1977, the evaluation committee met to prepare its recommendation to the Authority. The committee's unanimous recommendations, set forth in

pertinent part in the margin,[7] indicate that the committee carefully evaluated and compared the proposals and the clarifying responses.

---

[7] *"Recommendation*

"1. The proposal of Vicon Construction Company, Paulus & Sokolowski, Inc., Scientific Energy Recycling Corporation, Lincoln Park, New Jersey, a joint venture, be eliminated from consideration by the Authority.

"The proposal was unresponsive to the Request for Proposal of the Authority. While the capital cost was the apparent low proposal of all proposals, they presented no substantiating material in their proposal to indicate what they were providing to the Authority.

"Alternate I in their proposal was the Authority's 'desired system,' but they never mentioned it again in their proposal.

"Alternates II and III were variations on the Italian Sorain-Cecchini system. Purportedly, this system is operating in Europe, but our investigation indicated that the operation was restricted to very select solid waste and that it was producing animal food.

" . . .

"2. The proposals of Browning-Ferris Industries/Allis-Chalmers be eliminated from consideration by the Authority.

". . . While the proposal does respond favorably to the Request for Proposal on an engineering basis, a financial analysis of the proposal indicates that the Authority cannot afford the cost.

"3. The proposal of Raytheon Service Company, Burlington, Massachusetts, not be considered by the Authority.

"There are two basic reasons for this recommendation. The proposal was unresponsive to the Request for Proposal in that they would execute only a three year contract and the Request asked for a 20 year contract. In our questions to Raytheon, we asked them to clear this point up, but it never was to our satisfaction.

"The second reason for the recommendation is that their cost per ton is too high and there are three lower proposals.

"4. It is the recommendation of the Evaluation Team that there were two equal proposals submitted to the Authority. Both of these proposals are almost equal in price, engineering reliability and experience, and either one could provide the level of recycling the Authority desires in Region I. Both proposals have plusses and minuses which offset each other.

On October 21, 1977, on the basis of the committee's recommendation, the Authority authorized the evaluation committee to negotiate simultaneously with Waste Management and Sadoff-Rudoy. The evaluation committee met separately with Waste Management and Sadoff-Rudoy on Wednesday, October 26, 1977, at which time each was given a "series of non-negotiable items" and each was asked to respond to these items no later than Monday, November 14, 1977. Both "responded favorably to all items" by November 14.

On November 17, 1977, the evaluation committee concluded on the basis of weightings given the evaluation criteria listed in the RFP that Sadoff-Rudoy's proposal, as modified by its clarifying responses and its acceptance of the "non-negotiable items," was the superior proposal. The committee recommended that the Authority start

"Sadoff-Rudoy and Waste Management/Boeing are the two proposals which are so nearly equal that the Evaluation Team wants to keep both proposers under consideration by the Authority.

"The Evaluation Team has prepared a list of non-negotiable conditions to present to each of the proposers. Should either of the proposers not accept their non-negotiated conditions, then the Authority would negotiate with the other proposer for the 45 day period under the terms of the Request for Proposal.

"It is the unanimous recommendation of the Evaluation Team that the Authority authorize the Chairman and Executive Director, on behalf of the Authority, to enter into negotiations simultaneously with both proposers.

"The Evaluation Team expects that answers on the non-negotiated conditions would take not more than two weeks. The Negotiation Team would continue simultaneous negotiations for a period of up to 45 days (December 6) or until such time as the Team was convinced that one of the proposers was clearly superior to the other proposer, and would then make a recommendation to the Authority for execution of a contract.

"Should simultaneous negotiations break down with both proposers or go beyond 45 days (December 6), then renegotiation would be undertaken with the third lowest responsive proposer, Titan Environmental Service of Paramus, New Jersey."

immediate contract negotiations with Sadoff-Rudoy. At its November 17, 1977 meeting, the Authority voted to accept the recommendation of the evaluation committee. This decision was criticized by counsel representing Waste Management. Waste Management's counsel challenged the method used to evaluate the companies and the weighting attached to the negotiable and non-negotiable items that had been answered by the companies. He also questioned why the Authority was not entering into simultaneous negotiations with both companies. Chairman Paul explained that as long as Sadoff-Rudoy had been selected as best in the Authority's evaluation, the Authority did not want to burden Waste Management with the additional expense of further negotiations. After conferring with Mr. Harold Gerschowitz, Senior Vice President of Waste Management and Mr. Ron Heveran, Market Development Director of Waste Management, both of whom were also present at the November 17, 1977 meeting, Waste Management's counsel formally requested that simultaneous negotiations be conducted between the Authority and Sadoff-Rudoy and the Authority and Waste Management, under the clear understanding that Waste Management's proposal had been determined second best. Rescinding the previous vote, the Authority voted to accept the attorney's request. The Authority pointed out, however, that if during negotiations each party agreed to every term and condition agreed to by the other party, the Authority's previous determination that Sadoff-Rudoy was the superior contender would govern.

On January 9, 1978, at a meeting of the Authority attended by representatives of both Waste Management and Sadoff-Rudoy, extensive discussion was undertaken concerning the award of a contract for the Region I facility. Counsel for the Authority prefaced this discussion by stating that before the decision on the contract award was reached, the Authority would grant speaking

time to all who wished to express dissatisfaction with the Authority's procedures and decisions.

Among the complaints made by letter and at the meetings of the Authority by representatives of Waste Management were allegations that the evaluation committee did not give Waste Management sufficient credit on the evaluation criteria ratings; that Sadoff-Rudoy had been allowed secretly to change its proposal to become a low bidder via the Authority's "non-negotiable items"; that Waste Management was not given a similar opportunity to revise its proposal; that the Authority failed to give appropriate consideration to the fact that the air classifier proposed in the Sadoff-Rudoy system was not yet designed or built, while the air classifier proposed in Waste Management's system had operated successfully during extensive testing; and that the procedures followed by the Authority to award the contract were not those set out by the Authority itself.

Following Waste Management's questioning of the legality of the Authority's procedures, the Authority adopted a resolution which provided, in pertinent part:

"WHEREAS, The Authority has from the outset believed that no proposal was wholly responsive to its Request for Proposals; and

"WHEREAS, There is a good faith question as to whether the non-negotiable procedure followed by the Authority was equitable in its effect on all proposers;

"NOW THEREFORE, The Authority, in accordance with the discretion reserved by it in the Request for Proposals, hereby rejects all proposals and directs its staff and consultants to prepare necessary material for Authority action concerning a new proposal procedure."

On February 6, 1978, the Authority rescinded the January 9, 1978 resolution and determined that the contract for the Region I facility should be awarded to Sadoff-Rudoy. This determination followed a meeting of the Authority, attended by representatives of both Sadoff-

Rudoy and Waste Management, at which Sadoff-Rudoy's legal representative analyzed the statutes and rules by which the Authority was governed and concluded that the Authority's January 9, 1978 resolution to reject all proposals had been based upon an erroneous attack on the legality of the Authority's procedures.

In its memorandum opinion the trial court noted:

"While the seesaw actions of the Authority with respect to bidding and/or negotiation procedures for the project in question are hardly models of orderly administrative procedure, I do not consider that plaintiff [Waste Management] (or any other 'proposer') was misled thereby. The statutes, the advertisement for proposals, and the formal request for proposals gave ample indication that the Authority was proceeding on the basis of proposal and negotiation, rather than by competitive bidding; and it is authorized by statute to do so."

The record indicates that ch. 499, Stats., as well as the Authority's own rules and procedures, authorizes a proposal-negotiation procedure for award of the Region I contract and that the Authority's actual procedures were in substantial conformity with its announced procedures. Accordingly, the trial court concluded that Waste Management failed to demonstrate a reasonable probability of ultimate success on the merits, and the trial court refused to grant a temporary injunction. We cannot hold that there has been an abuse of discretion. The trial court's decision rests on a correct view of the law and is based on clearly relevant and proper factors. Accordingly we hold that the trial court did not err in denying the motion for a temporary injunction.

*By the Court.*—Order affirmed.