**CABOT LNG CORPORATION, Plaintiff,**

v.

**PUERTO RICO ELECTRIC POWER AUTHORITY, et al., Defendants.**

**Civil No. 94–2036 (DRD).**

United States District Court,
D. Puerto Rico.

March 26, 1996.

Amended Judgment Amending Decision
March 27, 1996.

Luis Sanchez–Betances, Sanchez Betances & Sifre, San Juan, PR, John C. Traficonte, Cabot Corporation, Boston, MA, Robert S. Frank, Jr., Choate Hall & Stewart, Boston, MA, for Cabot LNG Corp.

Miriam Soto–Contreras, Pedro Santiago–Torres, San Juan, PR, for Puerto Rico Electrical Power Authority (PREPA).

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Pending before this Court are cross motions for summary judgment. Plaintiff Cabot LNG Corp. ("Cabot") has moved for summary judgment requesting that defendant Puerto Rico Electric Power Authority ("PREPA") be enjoined from executing or performing under any contract for the sale of electricity unless that contract results from public bidding pursuant to section 15 of PREPA's Organic Act, P.R.Laws Ann. tit. 22,

§ 205 (1987) (Docket No. 5). Defendant PREPA and intervenors EcoEléctrica, L.P. ("EcoEléctrica") and AES Puerto Rico L.P. ("AES–PR") (collectively referred to as "Defendants") have filed a reply to Plaintiff's motion and moved for summary judgment requesting that Cabot's complaint be dismissed.[1] (Docket Nos. 11, 20, 31, 43). Subsequently, Plaintiff filed an opposition thereto. (Docket Nos. 45, 46). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. For the reasons set forth below, this Court grants summary judgment in favor of the Defendants and dismisses Cabot's complaint with prejudice.[2]

## I. FACTUAL BACKGROUND

The material facts regarding this case are not complex and are not in dispute. Rather, the dispute turns on questions of law. The following factual description is based on the affidavits, uncontested statements of material fact, and other pertinent materials submitted to this Court.

## A. THE PARTIES

Defendant PREPA is a public corporation of the Commonwealth of Puerto Rico. It generates, transmits, and distributes electricity to consumers in Puerto Rico. PREPA was formed in 1941; its powers are enumerated by its Organic Act, 22 L.P.R.A. §§ 191–247.

Intervenor EcoEléctrica is a Bermuda limited partnership whose general partners are Buenergia B.V. (a Dutch B.V.) and KES Bermuda, Inc. (a Delaware corporation).

Intervenor AES–PR is a limited partnership organized pursuant to the Laws of the State of Delaware and duly registered to do business in Puerto Rico. Its partners are AES Puerto Rico, Inc. and AES Las Mareas, Inc. (both Delaware corporations).

---

1. This Court previously granted the requests for intervention filed by AES–PR and EcoEléctrica. (Docket No. 48).

2. The Court, in its discretion, authorized the parties to supplement the summary judgment submittals, *Cia. Petrolera Caribe Inc. v. Arco Caribbean Inc.*, 754 F.2d 404, 410 (1st Cir.1985), on an

alleged administrative practice exempting the application of the competitive bidding law of Puerto Rico. P.R.Laws Ann. tit. 22, § 205. (Docket No. 57). The Court does not rely on the arguments of either party on this subject and decides this case on other grounds.

Plaintiff Cabot is a Delaware corporation engaged in the business of importing and selling liquefied natural gas (LNG) in the United States, and related business activities.

## B. PURPA AND THE EVOLUTION OF THE INDEPENDENT POWER INDUSTRY

Prior to 1978, most of the electric energy that electric utilities sold was generated at power plants developed and constructed by themselves. Slusser Aff. ¶ 8. To the extent that utilities purchased electricity, they purchased it from other electric utilities. In 1978, however, Congress enacted the Public Utility Regulatory Policies Act ("PURPA"), which transformed the electric utility industry. *Id.* Section 210 of PURPA, 16 U.S.C. § 824a–3, requires utilities to purchase electricity from independently-owned generation facilities that meet certain qualifications, known as "qualifying facilities" or "QFs." The Federal Energy Regulatory Commission ("FERC") promulgated regulations implementing PURPA. Among other things, these regulations establish the rates that utilities must pay for electricity. 18 C.F.R. § 292.304.[3]

Since PURPA was enacted into law, a whole new independent power industry has evolved in the United States. Slusser Aff. ¶ 8. Most new generating capacity constructed in the United States is now independently-owned, instead of being owned by electric utilities. Independently-owned electric generation facilities have allowed utilities to diversify their sources of generation and uses of fuel. Such facilities have also allowed utilities to avoid incurring the large capital costs associated with the construction of electric generation facilities because independently-owned generation facilities are also independently financed. Samson Aff. ¶ 5.

It is undisputed that a wide variety of skills and expertise are required to develop and operate an independently owned electric generation facility. Slusser Aff. ¶ 9; Samson

Aff. ¶ 6. Financial expertise is necessary to obtain the complex, off-balance sheet financing typically employed by these facilities, which cost hundreds of millions of dollars. Scientific and engineering expertise is required to successfully apply the advanced technologies that are frequently employed. Environmental expertise is required to satisfy the numerous federal, state and local environmental requirements. Specialized business expertise is required to finalize the fuel supply, power sales, and other contractual arrangements necessary for the operation of the facility. Finally, operational expertise is required to run the facility in an efficient, reliable, and economic fashion. Slusser Aff. ¶ 10; Samson Aff. ¶ 6.

## C. CIRCUMSTANCES LEADING TO THIS PROCEEDING

By 1993, after it became evident that the Cogentrix project would not go forward,[4] PREPA received numerous additional unsolicited proposals from private developers, including submittals from EcoEléctrica, AES–PR and Cabot, and evaluated them for possible incorporation into PREPA's electric system expansion plan. Samson Aff. ¶¶ 11–14. These proposals encompassed a wide variety of technologies and included locations throughout Puerto Rico.

The project developers made presentations regarding their projects to the Cogeneration Task Force, a group formed by the Government of Puerto Rico and consisting of the directors of several governmental agencies and other persons from the Executive Branch that were or might be involved in the formulation of Puerto Rico's public policy on energy. *Id.* Presentations also were made to the Puerto Rico House of Representatives' Committee on Socioeconomic Development and Planning. The presentations before the House committee were open to the public and were widely reported in the press. *Id.*

Of the proposals submitted to PREPA, five, including the submittals by EcoEléctri-

---

3. PREPA has been found to be subject to FERC's PURPA regulations. *See Puerto Rico Electric Power Auth. v. FERC,* 848 F.2d 243 (D.C.Cir. 1988).

4. The Cogentrix Company, which had an idea for a coal-fired project, executed a power sale agreement with PREPA, but the necessary permits were not obtained so the project was canceled. Slusser Aff. ¶ 11.

ca, AES–PR, and Cabot, were selected by PREPA for additional evaluation. Samson Aff. ¶ 19. In order to evaluate the proposals in depth, PREPA sent identical letters on September 29, 1993, to the five proponents requesting detailed additional information and enclosing a draft power purchase contract. *Id.* After PREPA received and evaluated each of the five responses, PREPA invited all proponents to individual meetings for further discussion of issues related to the project. *Id.* ¶¶ 20–22.

On February 25, 1994, PREPA informed EcoEléctrica and AES–PR by letter that they had been selected to supply electricity to PREPA in accordance with their proposals, pending the successful negotiation of a contract. One day later, PREPA informed Cabot by letter that its proposal had not been among those selected for inclusion in PREPA's expansion plan and advised Cabot that PREPA would consider a revised proposal in future expansion plan revisions.

Cabot did not easily accept the loss. In a letter to PREPA dated April 20, 1994, Cabot's counsel urged PREPA to "initiate negotiations with the third, fourth or fifth finalist," and "if the presently selected LNG project is rejected, [then] PREPA would turn to the next LNG alternative." This letter contained no suggestion that Cabot understood that PREPA was required to engage in a formal bidding process.

Almost three months later in a letter to PREPA dated June 15, 1994, Cabot stated to PREPA its belief that formal bidding was required. Complaint ¶ 14. Although having fully participated in PREPA's evaluation process, Cabot now expressed "considerable doubts and concerns ... about the process by which PREPA selected the projects for the supply of electricity ... announced in February," and, for the very first time, requested that PREPA initiate a public competitive bidding process pursuant to section 205 of PREPA's Organic Act.[5] PREPA responded by informing Cabot that section 205 was inapplicable to the process of selecting entities to supply electricity. Cabot then filed its complaint in this Court on July 29, 1994.

Subsequent to the filing of Cabot's complaint, EcoEléctrica and AES–PR continued negotiations with PREPA, and each company ultimately executed long-term contracts in which they agreed to finance, engineer, construct, and operate cogeneration plants generating electricity to be sold to PREPA well into the next century. They have also continued their development activities, including the following: (1) arranging for non-recourse "project financing" for their projects; (2) completion of conceptual engineering to support the filing of permits and other applications requiring agency approvals; (3) follow-up meetings with, and hearings before, those agencies responsible for granting permits and approvals; (4) conducting environmental, geotechnical, seismic, and marine studies in the proposed site areas; (5) preparation and submittal of permit and

---

5. Plaintiff originally requested a preliminary injunction. However, because Plaintiff actively participated in the procedure, it has "unclean hands." "He who seeks equity must do equity." *See K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 910 (1st Cir.1989). A party will not succeed in obtaining an injunction when it participated in the specific act sought to be enjoined. "One's misconduct need not necessarily have been of such nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct" constitutes "unclean hands." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery,* 324 U.S. 806, 815, 65 S.Ct. 993, 997–98, 89 L.Ed. 1381 (1945).

Puerto Rico recognizes the application of equitable remedy defenses such as that of "unclean hands." *See Asociacion de Vecinos de Villa Ca-*

*parra v. Iglesia Catolico,* 117 D.P.R. 346, 354 (1986); *Colon v. San Patricio Corp.,* 81 D.P.R. 242, 262 (1959). Further, the Puerto Rico Supreme Court has also adopted the rationales and theories underlying equitable remedy defenses. *See Colon,* 81 D.P.R. at 255.

Plaintiff therefore is barred from seeking equitable relief because of the applicability of the doctrine of "unclean hands." Plaintiff and four others participated in the private bidding process. Further, Plaintiff actively competed for the opportunity to develop the cogeneration plant by submitting proposals for the plant. Only after discovering that the development contract was not awarded to them, Plaintiff blew the whistle and informed PREPA that competitive bidding was required. Subsequently, Plaintiff sought to enjoin Defendants. However, Plaintiff's action exemplifies "unclean hands" and is thus impeded from obtaining equitable relief.

approval applications; (6) negotiation of fuel supply arrangements; (7) continuation of public education campaigns, including creation of education materials and organization of meetings with various groups to present the project; (8) analysis of tax issues and filing of requests and clarifications regarding those issues; (9) analysis of legal issues related to various aspects of the project including contract negotiations, land acquisition, etc.; (10) formation of the project entities; and (11) coordination with PREPA regarding project development. Samson Aff. ¶ 25. All of these activities require the involvement of highly skilled professionals with specific knowledge and expertise in their areas of involvement.

## II. SUMMARY JUDGMENT STANDARD

■ Summary judgment is appropriate in those cases in which "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The intricacies and general standards of Rule 56, have been documented by the First Circuit Court in a "cascade of cases."[6] The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In order to avoid the entering of summary judgment, the opposing party must then designate specific facts that show that there is a genuine triable issue. *Id.* at 324, 106 S.Ct. at 2553.

■ A fact is material if, under applicable substantive law, it may affect the result of the case. *Ortega–Rosario v. Alvarado–Ortiz,* 917 F.2d 71 (1st Cir.1990). A dispute is genuine only if there is conflicting evidence that requires a trial to resolve the discrepancy. *Id.* at 71. A court should deny a motion for summary judgment if the dispute about a material fact is genuine when, based on the

evidence, a reasonable jury could return a verdict for the nonmoving party. *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir.1994). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ In determining whether summary judgment is warranted, the Court views the facts alleged in the light most favorable to the nonmoving party and must indulge all inferences in favor of that party. *See Le-Blanc v. Great American Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); *Mottolo v. Fireman's Fund Ins. Co.,* 43 F.3d 723, 725 (1st Cir.1995); *Libertad v. Welch,* 53 F.3d 428, 435 (1st Cir.1995); *John & Kostas Service Station, Inc. v. Cumberland Farms, Inc.,* 948 F.2d 821, 822 (1st Cir.1991).

■ The party opposing the motion for summary judgment can not rely on "mere allegations or denials" of the pleadings. Fed. R.Civ.P. 56(e). Rather, the opposing party must be able to show by affidavits, depositions, answers, and admissions in the record that there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553.

## III. LEGAL ANALYSIS

■ According to Plaintiff, PREPA is required under section 205 to purchase electric energy through competitive bidding pursuant to detailed procurement regulations. Therefore, Plaintiff contends that because PREPA failed to use competitive bidding procedures for the purchase of electricity, PREPA must be enjoined from performing under its contracts with EcoEléctrica and AES–PR. This Court finds that the purchase of energy falls within the professional service exception to § 205 and as such PREPA is not required to utilize competitive bidding for the purchase of energy.

---

6. *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995) (citing *Coyne v. Taber Partners I,* 53 F.3d 454, 457–58 (1st Cir.1995); *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995); *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir. 1993); *United States v. Plat 20, Lot 17,* 960 F.2d 200, 204 (1st Cir.1992); *Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 351–52 (1st Cir.1992); *Griggs–Ryan v. Smith,* 904 F.2d 112, 115–16 (1st Cir.1990); *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 7–8 (1st Cir.1990); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48–49 (1st Cir.1990)).

## A. Professional Service Exception [7]

Competitive bidding statutes are effective tools aimed at preventing favoritism or collusion in the public arena.

> The open competition fostered by competitive bidding serves two recognized purposes. First and primarily, it protects the taxpayer or ratepayer by assuring efficient use of public revenues. Competitive bidding also serves to provide a fair forum for those interested in undertaking public projects.

*General Engineering Corp. v. Virgin Islands Water & Power Auth.,* 636 F.Supp. 22, 40 (D.V.I.1985), *aff'd,* 805 F.2d 88 (3d Cir.1986).

The Puerto Rico statute at issue in the present case is P.R.Laws Ann. tit. 22, § 205 (1987) (official translation), which reads in pertinent part:

> All bids for purchases and contracts for supplies or services, except for personal services, made by the Authority, including construction contracts, shall be advertised with sufficient time before the date the bids are opened, so that the Authority can guarantee public knowledge and appearance through competitive bidding.

Section 205 also sets forth six exceptions to the formal public bidding requirements, including a professional services exception. "Advertisement for bids shall not be required when ... professional or expert services or work are required and the Authority deems it in the best interests of good administration, that such work or services be contracted without such advertisement." P.R. Laws Ann. tit. 22, § 205 (1987).[8] The rationale of the exception represents the legislature's willingness to allow public bodies to freely evaluate the varying skills and qualifications of different professionals or experts rather than merely basing their decision on the party with the lowest bid.

The instant case is in all material aspects similar to the selection of a power supplier made by the Virgin Islands Water and Power Authority ("WAPA"). *General Engineering Corp.,* 636 F.Supp. at 22. In the midst of a potential energy crisis, WAPA began negotiations with an investment banking firm, Donaldson, Lufkin, & Jenrette ("DLJ"), to finance a third party cogeneration[9] project. *Id.* at 31–32. In 1985, DLJ and WAPA contracted to have Caribbean Energy Co., Inc. ("CEC"), a subsidiary of DLJ, construct, design, finance, and own the cogeneration plant. *Id.* at 33. Subsequently, the governor of St. Croix, on behalf of WAPA, intervened by signing an agreement with another corporation for the cogeneration plant and nullifying the DLJ contract. *Id.* at 37. CEC sued WAPA and WAPA argued that the DLJ contract was void for violating the competitive bidding statute. *Id.* at 38.

The United States District Court for the District of the Virgin Islands dismissed the suit, holding that the professional services exception from competitive bidding was applicable. *Id.* at 48. The court rejected the contention that "the contract is a mere sale of power" as "simplistic and wrong." *Id.* at 44. Instead, the court viewed the proposed project as a package consisting of many parts. Although some of the parts, such as the provision of the equipment, might have been, by themselves, subject to the competitive bidding statute, other parts, such as design and financing, clearly were exempt. *Id.* at 42. The court thus found that the

---

**7.** There seems to be no Puerto Rico case law interpreting the professional services exception within § 205. The parties, in their briefs, failed to cite any Puerto Rican case law on the issue. The Court did further research and was unable to find such case law. This Court then relies on the District of Virgin Islands' interpretation of a similar statute.

**8.** The professional services exception to the Virgin Islands' competitive bidding statute reads as follows: "Advertisement for bids shall not be required, however, when ... professional, financial (including financial printing) or other expert services or work are required and the Authority shall deem it best in the interest of good administration that contracts therefore be made without such advertisement...." V.I.Code Ann. tit. 30, § 116(a)(3). This statute is strikingly similar in language to the professional services exception in § 205 and as such this Court finds highly persuasive the District of the Virgin Islands' interpretation of the exception.

**9.** "Cogeneration facility means a facility which produces—(i) electric energy, and (ii) steam or forms of useful energy (such as heat) which are used for industrial, commercial, heating, or cooling purposes." 16 U.S.C. § 796(18)(A).

"issue in enforcing the Caribbean/WAPA contract is whether the exemption for financial or other professional services should be read to include all aspects of the package." *Id.* at 41–42. The "professional services" aspect of the project simply overrides other non-exempt phases.

In analyzing this issue, the court looked to "the relative importance of the services to the overall success of the project." *Id.* at 44 (citing *Waste Management, Inc. v. Wisconsin Solid Waste Recycling Auth.*, 84 Wis.2d 462, 267 N.W.2d 659 (1978); *Autotote Ltd. v. New Jersey Sports & Exposition Auth.*, 85 N.J. 363, 427 A.2d 55 (1981)).[10] In this regard, the court noted that the contract with Caribbean involved "law, economics, systems analysis, compatible models, environmental expertise, project management and most of all, enormous risks to the entrepreneur who finances the entire package." 636 F.Supp. at 44. Because these skills were vital to the success of the project, the court found that the entire package fell within professional services exemption. *Id.* at 45.

Similarly, the instant contract between Defendants was not merely for the purchase of energy as argued by Plaintiff during an Oral Argument held on September 25, 1995. The contract requires the construction, development, financing, and management of a cogeneration plant. This Court recognizes the complexity of such a plant and acknowledges that various expertises are required to set up and operate such a project, including scientific, engineering, financial, environmental, and operational expertises. In total, the development of a cogeneration or small power production facility requires a sophisticated package of highly specialized knowledge and skills. Therefore, the present contract falls within the purview of sec. 205's professional service exception.

Plaintiff argues that the *WAPA* case is distinguishable, because in that case one of the partners of the independent power company had also been engaged to give WAPA financial advice, a role that none of parties were retained to perform here. This distinction is overstated. The contract in dispute in the *WAPA* case was not the contract pursuant to which the financial advice was provided. Instead, it was the contract signed by WAPA for the "design, construction, financing, installation and operation of a cogeneration plant." 636 F.Supp. at 33. Furthermore, as the aforementioned quotes set forth above demonstrate, the provision of the entire "package" of skills involved led the court to conclude that the exemption was applicable, not merely the provision of financial advice. As a consequence, the *WAPA* case is directly on point, further supporting the interpretation that the similar provision in section 205(2)(d) would apply.

Further, in *Sea Air Shuttle Corp. v. Virgin Islands Port Auth.* 800 F.Supp. 293 (D.V.I. 1992), a subsequent decision by the same court involving the same professional and expert services exception to the Virgin Islands' public bidding statute, a sea plane service sued another competing service and the Virgin Islands Port Authority for wrongfully awarding an exclusive lease of sea plane ramps without conducting bidding. In that case, the competing service argued that the lease of the ramps was purely a real estate transaction, as Cabot argues that PREPA's cogeneration contracts with AES–PR and EcoEléctrica are merely purchases of electricity. The Court was not swayed by the argument and relied on the *WAPA* decision as controlling precedent without making the financial services distinction advanced by Cabot in this case:

> This position [purely a real estate transaction] oversimplifies the ... lease and

**10.** In *Autotote Ltd. v. New Jersey Sports & Exposition Auth.*, 85 N.J. 363, 427 A.2d 55 (1981), the New Jersey Supreme Court held that a contract for installation and servicing of a totalisator system at a racetrack operated by the New Jersey Sports and Exposition Authority involved inextricable integration of computer system and services of such technical and scientific nature as to constitute "professional services" within the statutory exception to requirements of public

bidding. The Court also considered the party challenging the award to be estopped given its participation in the negotiation process with the Authority. In *Waste Management v. Wisconsin Solid Waste Recycling Auth.*, 84 Wis.2d 462, 267 N.W.2d 659 (1978), the Court held that a contract for the design, construction and operation of a solid waste recycling facility fell under a "professional" services exception in a bidding statute similar to the one in the case at hand.

ignores the principle that in deciding whether the professional service exception is fulfilled, *a court must focus on the nature of the work implicit in the proposal or bid. See General Engineering Corp. v. Virgin Islands Water & Power Auth.,* 636 F.Supp. 22, 42 (D.V.I.1985), *aff'd,* 805 F.2d 88 (3d Cir.1986) [other citations omitted]. In this case, the work inherent in the lease of the sea plane ramps is the provision of sea plane service between the United States Virgin Islands and other islands. The Third Circuit recognized that the professional services exception allows a public agency the discretion to avoid competitive bidding when it is in the interest of good administration. *General Engineering Corp.,* 805 F.2d at 95 (citations omitted). Further, *the Third Circuit identified the public interest in reliability as a paramount concern in allowing services of an expert nature to be contracted for without compliance with competitive bidding requirements. Id.*

*Sea Air Shuttle,* 800 F.Supp. at 300–01 (emphasis added).

 In the present case, the public interest in reliability of the cogeneration projects is also of vital concern to PREPA in assuring the people of Puerto Rico that the Island's electric energy demands will be adequately met by 1997.[11] Complex scientific and engineering expertise and professional services are crucial in the start-up and continued operation of cogeneration projects such as those involved in this case. Reliability on these expert and professional services was, and continues to be a crucial determinative factor in the selection by PREPA of AES–PR and EcoEléctrica as its cogeneration partners, especially when it is uncontroverted that Cabot has never permitted, financed, constructed or operated an independent power facility. Consequently, PREPA was justified in contracting for those professional cogeneration services without complying with section 205's competitive bidding requirements.

## IV. CONCLUSION

For the reasons stated above, the Court hereby **GRANTS** the motion for summary judgment filed by Defendants and **DENIES** the motion for summary judgment filed by Plaintiff. Plaintiff's complaint and request for injunction are hereby dismissed with prejudice. Costs to be imposed to Plaintiffs; no imposition of lawyers fees is made since the Court does not find temerity by Plaintiff. *Rodriguez v. John Hancock Mutual Life,* 110 D.P.R. 1 (1980) (no obstinacy finding in first impression cases). *See also* P.R.R.Civ.P. 44.1(d), P.R. Laws Ann. tit. 32, App. III, R. 44.1(d) (1983).

**IT IS SO ORDERED.**

### AMENDED JUDGMENT

Our opinion and order and the judgment filed on March 26, 1996, is amended to correct the imposition of costs to Plaintiff instead of Defendants.

The Court having **granted** Defendants' motion for summary judgment (**docket nos. 11, 20, 31, 43**) and **denied** Plaintiff's motion for summary judgment (**docket no. 5**), judgment is hereby entered **DISMISSING** Plaintiff's claims **WITH PREJUDICE** against Defendant. Costs to be imposed to Plaintiffs; lawyer's fees are not to be imposed.

**IT IS ORDERED AND DECREED.**

---

11. Cabot argues, without any statutory support, that PREPA never made a finding that expert or professional services were required and it would be in the best interests of good administration to contract such services without bidding. While the statute, P.R.Laws Ann. tit. 22, § 205(3), recognizes PREPA's discretion in this matter, it does not impose on PREPA any obligation to make an express finding that the exception applies. The *WAPA* and *Sea Air Shuttle* cases are also apposite in the sense that in those cases the Court, in the context of a similarly worded statute, did not hold that an express finding by the governmental bodies was required for the exception to apply.