FLOTTUM and another, Appellants, vs. CITY OF CUMBERLAND and others, Respondents.

*April 12—May 7, 1940.*

For the appellants there were briefs by *Doar & Knowles* of New Richmond, and oral argument by *W. T. Doar*.

For the respondents there was a brief by *Daniel I. D'Amico,* city attorney, and *Loomis, Roswell & Chambers* and *Orland S. Loomis,* all of Mauston, of counsel, and oral argument by *Mr. Loomis* and *Mr. D'Amico.*

ROSENBERRY, C. J. The plaintiffs bring this action as taxpayers of the city of Cumberland on behalf of themselves and all others similarly situated. The facts cannot be better presented than by repeating the findings of the trial court, which will be stated in a slightly abbreviated and supplemented form. The city of Cumberland, a city of the fourth class, has never granted an indeterminate permit to any private utility, and has for thirty-three years owned and operated the only electric-distributing plant within said city, and until about the year 1918 generated its electrical energy by means of a steam plant owned, operated, and located in the city; that since 1918, the defendant has purchased electrical energy at wholesale from the Wisconsin Hydro Electric Company under a contract that expired in April, 1938; that when the Wisconsin Hydro Electric Company asked for an increase in the rates of its wholesale contract the city utility commission, the city council, and a citizens' committee made

an investigation, reported at public mass meetings, and gave wide publicity to the matter of rebuilding the distribution system and installing a Diesel electric-generating plant, the costs of which were to be financed by means of PWA grants and the proceeds of mortgage-utility-revenue bonds.

On October 7, 1938, the common council of the defendant city by resolution accepted an offer of the Public Works Administration to aid by federal grant in financing the construction and improvement of a street-lighting system in the amount of forty-five per cent thereof but not to exceed the sum of $14,737. The city's share of the cost was to be paid out of the proceeds of mortgage-utility-revenue bonds payable out of the earnings of the municipal electric utility only; that on the same date the common council by resolution accepted an offer of the Public Works Administration to aid by way of federal grant in financing the construction of a Diesel electric-generating plant in the amount of forty-five per cent of the cost thereof but not to exceed the sum of $42,075; the city's share of the cost was likewise to be paid out of the proceeds of utility-revenue bonds payable out of the earnings of the municipal electric utility only.

On July 13 and August 6, 1938, the city employed the firm of G. L. Van Fleet Company, consulting engineers, to make certain surveys and prepare plans and specifications relating to the work of rebuilding and extending the electric-utility plant of the defendant city. These contracts called for the performance of professional engineering services that required special skill and training, and were entered into on behalf of the city pursuant to the authorization of the common council.

On November 19, 1938, there was filed with the city clerk a sufficient petition under sec. 10.43, Stats., and by her certified to the council, containing the following resolution:

Section 1. That a referendum election be held: . . .

Shall the city of Cumberland install a Diesel Electric-Generating Plant?

Yes ☐   No ☐

Section 2. That the common council . . . shall provide for holding such referendum election. . . .

Section 3. That the common council . . . shall follow the wishes . . . of the electors as expressed in such referendum election, and shall put into effect the policy decided by such election.

The common council at a regular adjourned meeting on November 28, 1938, tabled the petition and passed a resolution calling for a special election on December 12, 1938, to submit to the voters the question whether the city should install a Diesel generating plant. The question was submitted in the following form:

"Shall the city of Cumberland install a Diesel electric-generating plant, and pay therefor by the issuance of Electric Utility Mortgage Bonds payable solely from the revenues of its electric system in the face amount of not exceeding $55,000, to be issued under the provisions of section 66.06 of the Wisconsin Statutes, 1937, and from the proceeds of a grant from the Federal Emergency Administration of Public Works of the United States of America in approximately the sum of $40,000?"

The election was held and a majority voted in favor of the proposition, 609 legal votes having been cast, 355 of which were in the affirmative, 250 in the negative and 4 blank votes.

On December 22, 1938, Ordinance No. 146 was duly passed by a majority of the members of the common council of the defendant city; this ordinance provided for the issuance of $70,000 electric-utility mortgage-revenue bonds of the city of Cumberland to bear interest at the rate of three and one-half per cent per annum, payable solely from revenues to be derived from the operation of the utility.

On January 16, 1939, Ordinance No. 147 was duly passed by a majority of the members of the common council of the defendant city. This ordinance appropriated and allocated the proceeds of the sale of $55,000 electric-utility mortgage-revenue bonds (being a part of the total issue of $70,000) as the maximum amount of such bond funds to be utilized in

connection with the installation of the said Diesel electric-generating-plant project. The proceeds of the sale of the remaining $15,000 electric-utility mortgage-revenue bonds were appropriated to be used solely for the construction of the extensions, additions, and improvements to the distribution system of the city electric utility, said sum being sufficient to defray the city's share of the cost of the project.

The electric-utility mortgage-revenue bonds were issued, sold, and delivered on December 31, 1938, to the Mairs-Shaughnessy Company of St. Paul, and before the commencement of this action said bonds were delivered to the purchasers pursuant to contract dated October 18, 1938, between the city and the said company. The ordinance authorizing the sale of the bonds ratified and confirmed the contract under which the bonds were purchased and directed their delivery to the purchaser as soon as might be and upon receipt of the purchase price, said bonds being sold at ninety-seven per cent of their par value, including the discount. The proceeds of the bonds represented an interest cost of slightly less than four per cent per annum to the city.

The bonds were in the usual and customary form and mature serially on December 1 of 1940 to 1953. The said bonds did not constitute an indebtedness of the city of Cumberland, and were payable solely from the revenues of the electric-utility system, and expenditures were made from the proceeds of the sale of the bonds before the commencement of this action.

For the year 1938, the assessed valuation of the city of Cumberland was $1,558,519. Prior to the issuance of the mortgage-revenue bonds the city had a bonded indebtedness of $27,000, payable annually over a period of years.

On October 22, 1938, the city's electric-distribution system was disabled by a severe sleet storm which endangered the life, property, and welfare of the community, because of which work was begun on the distribution system and paid

for from funds from the general utility fund, and the cash surplus and reserve from the treasury of the utility commission, all of which funds were fairly spent, and for which the city has received full benefit, and all of which were spent before the commencement of this action. There was no diversion or appropriation of any general city funds for any of the extensions, additions, and improvements, including installation of the Diesel electric-generating plant, and all moneys appropriated and expended on said projects were authorized and appropriated by the city council from the funds of the utility commission.

On April 14, 1939, the records of the proceedings of the common council and the utility commission were amended, which amendments the trial court found did not contradict or vary any previous record which had been made, but supplemented such record by showing action of the council and commission which had actually occurred at meetings but which, through oversight, the clerk had failed to record.

The trial court further found that such amendments were submitted by the clerk at later meetings and were adopted unanimously by the same members of the council and commission who were members at the time the meetings were originally held.

The court further found that all of the members of the council and commission were legally qualified members; that a majority of the members of the common council on December 20, 1938, passed the following resolution:

"A resolution providing for a waiver of the fixation of rates in connection with any increase cost of service resulting from the installation of a Diesel electric-generating plant in the city of Cumberland,"—

which was filed with the public service commission pursuant to sec. 196.49 (4), Stats., and the order of the public service commission of December 23, 1938, granting to the city of

Cumberland a certificate of authority to install a Diesel generating plant, was issued.

Upon these findings the trial court concluded as a matter of law that plaintiffs' complaint should be dismissed and specifically made certain other conclusions of law which we need not set out at this time.

Upon this appeal the plaintiffs contend: (1) That the contracts with the G. L. Van Fleet Company were invalid; (2) that there was no legal justification for the expenditure of money by the council on the projects; (3) that the city in accepting PWA grants obligated itself to spend money beyond the constitutional and statutory limitations; (4) that the purported sale of bonds was void; (5) that the bond ordinance providing for $70,000 electric-utility mortgage bonds was void; (6) that the council was without power to pass the waiver resolution; (7) that the claimed amendments to the council and utility proceedings were inadmissible; and (8) that there were other defects in the official record.

(1) With respect to the contracts with the G. L. Van Fleet Company, the principal contention of the plaintiffs is that the service rendered by the Van Fleet Company was "work" within the meaning of sec. 62.15 (1), Stats., which provides:

"All public work, the estimated cost of which shall exceed five hundred dollars, shall be let by contract to the lowest responsible bidder. . . ."

No bids having been taken, it is the contention of the plaintiffs that the contract with the Van Fleet Company was invalid because of failure to comply with sec. 62.15 (1), Stats. The question whether a contract to perform professional services is a contract to do public work within the meaning of sec. 62.15 (1) does not appear to have been considered in this state. A similar statutory provision of the state of New Jersey was considered in the case of *Franklin v. Horton* (1922), 97 N. J. Law, 25, 116 Atl. 176, where it was

held that a contract for engineering services to prepare plans and specifications for an electrical-distribution system for public lighting was not within the statute. The court said (p. 28):

"We think that provision has no application to a contract with an engineer for the preparation of plans and specifications for an electric-light distribution system, because such services require scientific knowledge and professional skill, and are not comprehended by the legislature designation 'work,' 'materials,' 'supplies,' and 'labor.' "

See supporting authorities 44 A. L. R., beginning at p. 1150.

In addition to the consideration already mentioned, sec. 66.06 (10) (a), Stats., provides:

"In cities owning a public utility, the council shall . . . provide for a nonpartisan management thereof, . . . to supervise the operation of the utility under the general control and supervision of the . . . council."

Sec. 66.06 (10) (d), Stats., in part, provides:

"and that the commission have such general powers in the construction, extension, improvement and operation of the utility as shall be designated."

In this case the contract with the Van Fleet Company was entered into by the utility commission pursuant to authorization of the common council. The record shows that the services rendered by the Van Fleet Company were professional engineering services upon the basis of which application was made for the PWA grants, and pursuant to which the improvements of the distribution and generating system were made. It is considered that the trial court correctly held that under general principles and the quoted provisions of the statute, these services were not within the provision of sec. 62.15 (1), Stats.

(2) Plaintiffs complain that there was no legal justification for the expenditure of certain moneys upon the projects

in question, and specify sums paid to one Melvin Lerdall as a member of the utility commission and as a member of the council, it appearing that he drew compensation from and acted as a member of both of these bodies, which amounted in the year 1938 to $585 and from January to March, 1939, $185.50. The greater part of these moneys had been paid before this action was begun. From an examination of the complaint we do not find that the question of validity of these expenditures is within the issues in this case. However, Lerdall was entitled to hold both offices under the express provisions of sec. 66.11 (2), Stats., which authorizes members of the council to represent the council on city commissions.

(3) It is the next contention of the plaintiffs that the defendant city in accepting the PWA grants obligated itself to spend money beyond the constitutional and statutory limitations. This question was passed upon specifically in *Payne v. Racine* (1935), 217 Wis. 550, 560, 259 N. W. 437. In that case a similar grant had been accepted by the city of Racine for the construction of an extension to a sewage-disposal plant, which was under the statutes a public utility. There, as here, the income of the utility was pledged to secure certain mortgage-revenue bonds. The court held:

"Any debt so secured does not constitute an indebtedness under the terms of the constitution." See sec. 66.06 (9) (b), 1, Stats.

No contention is made that the payment of these bonds is in any way secured by general taxation. They are liens solely upon the revenues of the utility.

(4) It is next contended that the purported sale of bonds was void, the issue of the bonds not having been authorized nor the bonds issued at the time the contract of sale was made. As appears from the statement of facts, the bonds were sold pursuant to an agreement entered into by the

Mairs-Shaughnessy Company on October 18, 1938. Subsequently the common council duly confirmed the arrangement, by section 7 of Ordinance No. 146, adopted and published December 22, 1938. While there was no advertisement for bids, the bonds were sold as a result of competitive bidding. Sec. 66.06 (9) (b), 1, Stats. 1937, pursuant to the provisions of which these bonds were issued, is as follows:

". . . Such bonds [revenue bonds] shall be sold in such manner and upon such terms as the board or council shall deem for the best interests of said municipality. . . ."

Plaintiffs contend that this section is inapplicable, and that the disposition of the bonds issued in this case is subject to ch. 67, Stats., relating to municipal borrowing and municipal bonds.

Sec. 67.01 (8), Stats.: "This chapter is not applicable: . . . (g) Nor to mortgage bonds or mortgage certificates issued for the purpose of acquiring public utilities, including street railways, pursuant to section 66.06.".

It is argued that in this case there was not an acquisition, and therefore the bonds issued by the defendant city were not for an acquisition and for that reason subject to ch. 67, Stats.

Sec. 66.06 (9) (a), (b), Stats., is as follows:

"(a) Any town, village, city or power district may, by action of its governing body, provide for purchasing, acquiring, leasing, constructing, extending, adding to, improving, conducting, controlling, operating, or managing a public utility from the general fund, or from the proceeds or municipal bonds, mortgage bonds or mortgage certificates. . . .

"(b) Where payment is provided by mortgage bonds, the procedure for payment shall be in the manner following: . . ."

It seems quite clear that the special provisions of sec. 66.06 (9) (b), 1, Stats., control over the provisions of ch. 67, Stats. It is the clear intent of the legislature to except bonds issued pursuant to sec. 66.06 from the provisions of ch. 67.

The contention of the plaintiffs upon this point must be overruled.

(5) It is argued that the bond ordinance which provided for the issuance of $70,000 of electric-utility mortgage bonds and all the proceedings had in connection therewith were void. It will be recalled that a sufficiently signed petition for a referendum was filed with the common council on October 18th, and amended on October 31, 1938. This called for the adoption of the proposed ordinance by the common council or its submission to the electors in accordance with the provisions of sec. 10.43. Sec. 10.43 (4) provides:

"Such proposed ordinance or resolution shall thereupon either be passed without alteration by said common council within the thirty days next following the date of the clerk's final certificate, or it shall be submitted without alteration by said council to the electors of the city at the next regular election. . . ."

Sec. 66.06 (8) (b), Stats., provides:

"A resolution, specifying the method of payment and submitting the question to a referendum, shall be adopted by a majority of all the members of the board or council at a regular meeting, after publication at least one week previous in the official paper."

Sec. 66.06 (8) (c), Stats., provides:

"The notice of the referendum shall include a general statement of the plant equipment or part thereof it is proposed to acquire or construct and of the manner of payment."

The council proceeded under sec. 66.06 (8) (b) and (c), Stats., and ignored the petition filed under sec. 10.43. Sec. 10.43 clearly contemplates that the proposed ordinance shall be one which the common council has the power to adopt. The legislature having prescribed the referendum which shall be submitted in acquisition proceedings, it seems clear that the common council would have no authority to

modify the express provisions of the statute and adopt a different procedure. The council having no such authority, it is considered that sec. 10.43 has no application to a situation such as existed in this case. What the electors demanded was submission of a question which would have modified a statutory provision.

(6) It is further contended that the ordinance providing for the issuance of $70,000 of electric-utility mortgage bonds and the proceeding in connection therewith were void. This contention is based upon the following facts: Sec. 66.06 (8) (a), Stats., provides:

"Any town, village or city may construct, acquire or lease any plant and equipment located within or without the municipality," etc.

Sec. 66.06 (8) (b) and (c), Stats., are set out *supra*.

As already appears, the question whether the city should install a Diesel generating plant was submitted to the electors on December 12, 1938, but it does not appear that prior to the holding of such election the resolution was published in the official paper at least one week previous to the election, and for that and other reasons the plaintiffs argue the bond issue was void. This requires us to determine whether a bond issue made for the purpose of extending and adding to an already existing plant must be made in compliance with sec. 66.06 (8) (b) and (c).

Sec. 66.06 (9) (a), Stats., has been set out *supra*.

It is to be noted that the purposes for which bonds may be issued contained in sub. (9) (a) are much more extensive than the provisions contained in sub. (8) (a). The city having in this case owned and operated its own generating and distribution plant for many years, and being at the time of the issuance of the bonds the owner of its distribution system, we can see no reason why funds may not be raised for improving and adding to the existing system without sub-

mitting the matter to a referendum. The real question for decision was whether the city should operate its own generating plant or continue to purchase electrical energy from the supplier. That under the statute is not an acquisition of a plant in any sense of that term. A decision of that question merely settles a matter of management and control. In support of the plaintiffs' contention we are cited to *Wisconsin P. & L. Co. v. Public Service Comm.* (1936) 222 Wis. 25, 267 N. W. 386, where it was held that under the circumstances of that case a referendum was necessary. However, that was an acquisition proceeding pure and simple. Likewise *Appleton Waterworks Co. v. Appleton* (1903), 116 Wis. 363, 93 N. W. 262, concerned a bond issue made for the purpose of constructing a plant. We conclude from the fact that sec. 66.06 (8) (a) omits the words "extending, adding to, improving, conducting, controlling, operating or managing a public utility" that it was clearly the intent and purpose of the legislature in cases where funds were raised for those purposes under sec. 66.06 not to require the referendum provided for in sub. (8) (a).

(7) It appears that on April 17, 1939, certain amendments to prior proceedings of the council were made, and a few days later at the meeting of the utility commission its proceedings were also amended. The city clerk testified that the amendments were prepared in the city attorney's office; that the minutes of the previous meetings had been read and approved, and it further appeared that all of the amendments were made after this action was begun. As already stated, the trial court found that the amendments did not contradict or vary the previous record but supplemented the record by showing the action of the council and the commission which had actually occurred at the meeting but which through oversight the clerk failed to record; that such amendments were unanimously adopted and at the time of the adoption the same persons were members of the council and utility com-

mission at the time of the meeting. Nothing appears to in any way impeach this finding of the trial court and we perceive no reason why amendments may not be made to conform to the fact where there is no attempt to contradict, merely to supplement the records in accordance with the fact. The amendments appear to us to be proper.

(8) On December 23, 1938, the public service commission ordered that a certificate of authority be issued to the city of Cumberland to construct a Diesel electric-generating plant subject to the condition that the city of Cumberland as a public utility should waive consideration by the commission in the fixation of rates of the increase, if any, in costs of service which may be occasioned by the proposed installation of such Diesel generating plant. On October 25, 1938, the city applied to the public service commission for permission to install a Diesel electric-generating plant. The council adopted a resolution providing for such waiver. It is claimed by the appellants that the council was without power to pass the resolution of waiver. It is considered that this position is not well taken. The city was engaged in the operation and maintenance of a public utility. The public-utility laws apply to a city the same as to any other public utility. Sec. 196.01 (1), Stats. Its rates are subject to supervision by the public service commission the same as those of other public utilities. Assuming that the issuance of the certificate was necessary, we see no reason why the city the same as any other utility may not meet the conditions imposed by the public service commission.

Other questions are raised which we do not consider it necessary to discuss.

*By the Court.*—Judgment affirmed.