## ATTLIN CONSTRUCTION, INC., Plaintiff–Appellant,

v.

## MUNCIE COMMUNITY SCHOOLS and Board of Trustee of Muncie Community Schools: J. Richard Marshall, President, John Wesley Wray, Vice–President, Joan Murray, Secretary, Hurley Goodall and Jack Donati, Members, Jacobs–Maze and Associates, and Dale L. Jacobs and Ronald G. Maze, Defendants–Appellees.

No. 2–178A4.

Court of Appeals of Indiana, Fourth District.

Dec. 8, 1980.

Rehearing Denied Dec. 24, 1980.

John T. Cook, Winchester, Wayne J. Lennington, Muncie, Frank E. Spencer, Indianapolis, for plaintiff–appellant.

Alan H. Lobley, Ice, Miller, Donadio & Ryan, Indianapolis, for Geupal Demars, Inc., as amicus curiae.

Frank E. Gilkison, White, Beasley, Gilkison, Retherford & Buckles, Samuel L. Reed, DeFur, Voran, Hanley, Radcliff & Reed, Muncie, for defendants–appellees.

MILLER, Judge.

Plaintiff–appellant Attlin Construction, Inc. (Attlin) appeals the judgment of the Delaware Circuit Court in favor of the defendants–appellees, Muncie Community Schools and the Board of Trustees of Muncie Community Schools (Muncie Schools), Jacobs–Maze and Associates (Jacobs–Maze), Dale L. Jacobs and Ronald G. Maze (the individual partners), entered upon the appellees' motions for an involuntary dismissal pursuant to Ind.Rules of Procedure, Trial Rule 41(B).

After Muncie Schools rejected all of Attlin's bids on 23 of 27 different construction projects at each addition to the Garfield and Sutton Elementary Schools in Muncie, Attlin sued Muncie Schools alleging it had violated the bidding statute in effect at that time, Ind.Code 5–16–1–1 (1976), by failing to let for bid the construction management contract it awarded Jacobs–Maze of Richmond, Indiana. Rather than let this contract for bid, in late 1975 Muncie Schools conducted a series of interviews with various architectural and engineering firms before contracting the engineering firm of Jacobs–Maze to serve as the "construction manager" supervising the design and construction of the two additions. Under the terms of its contract Jacobs–Maze received a fee of 4% of the total construction contracts for the 27 individual projects at each addition.

On appeal, Attlin seeks reversal of the trial court's judgment presenting for our consideration the sole question of whether the trial court erred in finding that Muncie Schools possessed the power to enter into a construction manager contract without submitting it for bids pursuant to IC 5–16–1–1 which required that all public construction contracts in excess of $5,000 be let for public competitive bids. For the reasons stated

below we affirm the decision of the trial court.

## DECISION AND DISCUSSION

At the bench trial of Attlin's complaint, Attlin did not present any evidence but relied on the evidence it had introduced previously at a hearing on its unsuccessful request for a temporary injunction. Neither at the hearing nor the trial did the defendants present any evidence; rather, they each moved for an involuntary dismissal of the complaint pursuant to T.R. 41(B).[1] The trial court granted these motions and entered judgment accordingly. Attlin appeals, arguing the court's ruling was contrary to the law as the evidence demonstrated that Muncie Schools hired Jacobs–Maze as the construction manager of the two additions despite lacking the power to do so without submitting the construction manager contract to public competitive bidding. Appellees argue that Attlin failed to establish a *prima facie* case that Muncie Schools lacked such power.

*Building Systems, Inc. v. Rochester Metal Prods., Inc.* (1976), 168 Ind.App. 12, 340 N.E.2d 791, enunciates our scope of review for deciding the issue presented in this appeal.

"The language of [T.R. 41(B)] requires the trial court to consider only the evidence and inferences most favorable to the non–moving party in ruling upon such a motion. The trial court may not weigh the testimony of one witness against the conflicting testimony of another witness, nor may it weigh conflicting portions of the testimony of the same witness. *Ohio Casualty Ins. Co. v. Ver-*zele et al. (1971), 148 Ind.App. 429, 267 N.E.2d 193. Thus, our Trial Rule 41(B), *supra,* differs from Federal Rule 41(b) in that under the Federal Rule the trial court need not consider only the evidence and reasonable inferences therefrom most favorable to the non–moving party, but is free to determine whether the plaintiff (or party with the burden of proof) has established a right to recovery by a preponderance of the evidence during his case–in–chief. *Emerson Electric Co. v. Farmer,* (5th Cir., 1970), 427 F.2d 1082; *Ellis v. Carter* (9th Cir., 1964), 328 F.2d 573, 577; *Motorola, Inc. v. Fairchild Camera and Instrument Corp.* (D.C.Ariz., 1973), 366 F.Supp. 1173, 1176. See also; 9 Wright and Miller Federal Practice and Procedure, § 2371, at 224–225; Moore's Federal Practice, Vol. 5, § 41.13[4], 1155–60.

Because the trial court may consider only the evidence and inferences favorable to the non–moving party in ruling upon a motion for involuntary dismissal, this Court must determine whether there was evidence introduced which could have been sufficient to support a recovery by such party when the granting or denial of such a motion is an issue on appeal. In the case at bar, then, the issue is whether the trial court properly found that there was no substantial evidence of probative value which would have supported the material allegations of the contractor."

168 Ind.App. at 13–14; 340 N.E.2d at 703.

The facts most favorable to Attlin contained in the record of this cause, derived from its witnesses and exhibits, are as fol-

1. T.R. 41(B) provides:

Involuntary dismissal: Effect thereof. After the plaintiff or party with the burden of proof upon an issue, in an action tried by the court without a jury, has completed the presentation of his evidence thereon, the opposing party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that considering all the evidence and reasonable inferences therefrom in favor of the party to whom the motion is directed, to be true, there is no substantial evidence of probative value to sustain the material allegations of the party against whom the motion is directed. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff or party with the burden of proof, the court, when requested at the time of the motion by either party shall make findings if, and as required by Rule 52(A). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision or subdivision (E) of this rule and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, operates as an adjudication upon the merits.

lows:[2] Recognizing the need to construct additions to the Garfield and Sutton Elementary Schools, in November, 1975 Muncie Schools began interviewing architectural and engineering firms to design and oversee the construction of these additions. On December 9, 1975 Muncie Schools signed the Muncie firm of Graham, Love & Taylor (Graham, Love) as the architect for both additions. Rather than employ a general contractor, Muncie Schools contracted Jacobs–Maze, an engineering firm, as the construction manager for both additions on January 9, 1976.[3] Utilization of the con-

2. Attlin presented nine witnesses at the temporary injunction hearing including three members of the Muncie Community School Board, two architects (one from Graham, Love & Taylor and one from Attlin), Attlin's owner and three contractors who worked on the two additions to the two schools.

3. In an informative and useful *amicus curiae* brief, Geupel Demars' attorneys explained the purpose of utilizing the construction manager method and the function a construction manager serves in a building project as follows:

"Public agencies are under increasing pressure to save time and money in developing new public facilities. Factors such as inflation, the energy crunch, strikes and generally more complex facility requirements, however, have made these goals more difficult to achieve.

Construction Management (CM) has been developed as an alternative to the traditional public building process. Construction management seeks to save an owner time and cost primarily through better activity coordination and project management. Many private developers and major Federal agencies, including the General Services Administration (GSA) and the Department of Health, Education and Welfare–along with many state and local jurisdictions–have found that construction management can help to save time, money, and aggravation for the building owner.

Savings with construction management have been impressive in many instances. GSA reports design and construction time savings of up to two years on certain projects. Several public agencies report time savings of more than six months. These savings [are] developed by reducing the impact of inflation, cutting costs for interim construction loans, reducing contingency amounts in contractor bids, and shortening rental periods for temporary agency quarters, prior to occupancy. Each of these factors saves real dollars. Certain techniques available through the use of construction management make a major contribution to these savings. Value Management, for instance, can be used effectively by the construction manager in this system and has produced consistent savings of 8–to–1 over the cost of its use....

The construction management technology centers on utilization of a construction manager who coordinates and manages the building process. The construction manager acts as a fiduciary for the owner, a fact which makes the project a cooperative team effort rather than a proceeding among adversaries, a situation which is not uncommon in public sector construction. These relationships are backed up by Critical Path Method (CPM) or PERT scheduling, detailed cost estimating, and cost accounting. These techniques are often computer–based, and a competent construction manager will use them with great effectiveness to control a project.

\*      \*      \*      \*      \*      \*

The usefulness of construction management increases in proportion to project complexity and cost. The total construction management approach can be used on a cost–effective basis for complex projects with construction costs of $3 million and above. On the other hand, individual parts of construction management technology, such as Value Management, may be applicable and can yield real cost benefits on projects costing $1 million and often less.

Several public developers report that they perform construction management functions in–house. Most, however, obtain this service from an outside firm under a professional service contract....

\*      \*      \*      \*      \*      \*

"Construction Management (CM) refers to a type of contractual and professional working relationship initiated by a building owner for project design professionals and the construction manager. The approach can be applied to construction of a particular facility or for construction of several related facilities within an overall construction program. The construction manager may be an individual or a group of individuals on the owner's staff. More frequently, however, the construction manager represents an outside firm or joint venture working as an agent of the jurisdiction acting in the owner's best interest under a professional services contract on a specific construction project.

Many variations of the construction management approach have been used by private developers and public construction agencies. Because of the special characteristics of each major building project and rules and regulations specific to each jurisdiction, no single form of construction management relationship will best suit the particular needs of all jurisdictions....

Construction management is most effective when employed from a project's predesign stage through construction until final occupan-

struction manager process saved Muncie Schools 4–5% in professional fees since Jacobs–Maze charged only 4% of the construction cost as its fee while the testimony at the trial revealed that a general contractor would have realized a profit equal to 8–9% of the construction cost. Over the next four months information concerning the specifications for all 27 projects on each addition was made available to prospective contractors. This information included Muncie Schools' intention to utilize the construction manager method rather than the general contractor method for building the additions. Attlin's president testified that by the end of April, 1976 he knew the

construction manager method was going to be utilized by Munice Schools. Attlin, a general contractor, bid on 23 of the 27 projects at each elementary school; however in May, 1976 all their bids were rejected and other contractors were awarded those jobs. Construction began shortly thereafter in early June, 1976.

Attlin introduced into evidence the construction manager contract between Jacobs–Maze and Muncie Schools. This contract required Jacobs–Maze to perform services in two different phases: (1) the design phase; and (2) the construction phase.[4] Jacobs–Maze did not have to actu-

---

cy. It is possible, however, to employ construction management services for only a single phase of a project, but the benefits of the approach may not be fully realized.

\*   \*   \*   \*   \*   \*

Quoted from PUBLIC TECHNOLOGY, INC., USING CONSTRUCTION MANAGEMENT FOR PUBLIC AND INSTITUTIONAL FACILITIES, 1–2, 9–12 (Washington, D.C., March, 1976.)

4. Within each phase Jacobs–Maze's general duties can be summarized as follows:

A. Design Phase:

1. Consult with Muncie Schools and Graham, Love during the projects' development and review conceptual designs to assist in designing the projects.

2. Develop and update the projects' time schedules, coordinating and integrating into it the architect's services with construction schedules.

3. Prepare and update the projects' budgets for the owner's approval, basing the budgets upon the drawings and specifications.

4. Review drawings and specifications as they are prepared, recommending alternative solutions whenever design details affected construction feasibility schedules.

5. Determine applicable equal employment opportunity program requirements for inclusion in contract documents.

6. Prepare pre–qualification criteria for bidders and develop contractor interest in the projects.

7. Establish bidding schedules and conduct pre–bid conferences to familiarize bidders with the bidding documents and management techniques as well as with any special systems, materials or methods.

8. Receive bids, prepare bid analyses and make recommendations to Muncie Schools for awarding contracts or rejecting bids.

9. Conduct pre–award conferences with successful bidders.

10. Assist Muncie Schools in preparing construction contracts.

B. Construction Phase:

1. Coordinate the contractors' work with the activities and responsibilities of Muncie Schools and Graham, Love to complete the additions within the cost, time and quality objectives.

2. Schedule and conduct pre–construction and progress meetings at which Muncie Schools, Graham, Love, Jacobs–Maze and the contractors jointly discussed construction procedures, progress, problems and scheduling.

3. Revise and refine the approved estimate of construction costs, incorporating approved changes as they occur and developing cash flow reports and forecasts as needed. Additionally, advise Muncie Schools and Graham, Love whenever projected costs exceed the budgets or estimates.

4. Review requests for design changes, recommending necessary or desirable design changes to Muncie Schools and Graham, Love, and assist in negotiating change orders.

5. Develop and implement a procedure for reviewing and processing contractor's applications for progress and final payments. Also, make recommendations to Graham, Love for certification to Muncie Schools for payment.

6. Assist in obtaining all building permits and special permits for permanent improvements, excluding those permits required to be obtained directly by the various contractors.

7. Verify that Muncie Schools has paid all applicable fees and assessments for permanent facilities.

8. If required, assist Muncie Schools in selecting and retaining professional consultants for surveying and testing laboratories as well as coordinating such services.

9. Inspect the contractors' work to assure that it conformed to the contract requirements.

ally construct any part of either addition. Rather, through coordinating the solicitation and acceptance of bids for the 27 projects at each school during the design phase and sharing with the architect general supervisory authority over the work performed in the construction phase, Jacobs–Maze synchronized the entire construction package.

IC 5–16–1–1 required a public body to submit for competitive bidding any contract for construction in excess of $5,000.[5] This statute must be read in conjunction with Ind.Code 20–5–2–2 which specifies the powers possessed by the governing bodies of school corporations in Indiana. Specifically, Muncie Schools possessed the power:

"(1) ... to enter into contracts in matters permitted by applicable law.

(2) ... to establish, locate and provide the necessary schools, ... other buildings, facilities, property and equipment therefor.

(3) To acquire, construct, erect, maintain, hold, and to contract for such construction, erection or maintenance, of such real estate, or real estate improvements, or any interest in either, as the governing body deems necessary for school purposes, including but not limited to buildings, parts of buildings, [and] additions to buildings, ....

\* \* \* \* \* \*

(7) To employ, contract for and discharge superintendents, supervisors, principals, teachers, librarians, business managers, superintendents of buildings and grounds, janitors, engineers, architects, physicians, dentists, nurses, accountants, teacher aides performing non–instructional duties, educational and other professional consultants, data processing and computer service for school purposes, ..., and such other personnel or services, all as the governing body considers necessary for school purposes ; ....

\* \* \* \* \* \*

(19) To exercise any other power and make any expenditure in carrying out its general powers and purposes provided in sec. 201 or in carrying out the powers delineated in this sec. 202 which is reason-

---

10. In collaboration with Graham, Love, establish and implement procedures for expediting the processing and approval of shop drawings and samples.

11. Record the progress of the projects, submit written progress reports to Muncie Schools and Graham, Love as well as maintain a daily log for Muncie Schools and Graham, Love.

12. Maintain at the project site, on a current basis all documents and revisions which arise out of the contract or the work.

13. Accept delivery and arrange storage, protection and security for all owner–purchased materials, systems and equipment.

14. Prepare a list of incomplete or unsatisfactory items along with a schedule for their completion after a contractor substantially completes his work or a designated portion thereof. After Graham, Love certifies the work to be completed, supervise the correction and completion of the work.

15. With the Muncie Schools' maintenance personnel, direct the check out of utilities, operational systems and equipment for readiness and assist in their initial start–up testing.

16. Determine final completion, providing written notice to Muncie Schools and Graham, Love that the work was ready for final inspection.

17. Secure and transmit to Graham, Love required guarantees, affidavits, releases, bonds and waivers.

18. Turn over to Muncie Schools all keys, manuals, record drawings and maintenance starts.

19. Develop and implement a procedure for the review and processing of applications by contractors for progress and final payments.

5. IC 5–16–1–1 (1976) provides in pertinent part:

"When any public building or any other public work or improvement of any character whatsoever is to be constructed, ... at the expense of ... any ... school corporation, ..., and when the estimated cost of such work or improvement will be five thousand dollars ($5,000) or more, it shall be the duty of the ..., school corporation, ... to adopt plans and specifications and award a contract for such public work or improvement to the lowest and best bidder who submits a bid for the performance thereof: ...."

1978 Acts, Pub.Law 15, § 2 raised the limit from $5,000 to $25,000. This modification is codified at IC 5–16–1–1 (1980 Supp.)

*able from a business or educational standpoint in carrying out school purposes of the school corporation, including but not limited to* the acquisition of property or the employment or *contracting for services, even though such power or expenditure shall not be specifically set out herein; and the specific powers set out in this section shall not be construed to limit the general grant of powers* provided in sec. 201 except where a limitation is set out in this act by specific language or by reference to other law." (Emphasis added)

On appeal, Attlin concedes that since Muncie Schools elected to utilize the construction manager building process instead of the general contractor process, it was necessary to hire someone to oversee the work on each addition. Additionally, Attlin does not argue that Muncie Schools lacked the power pursuant to IC 20–5–2–2(7) to enter into the architect's contract without letting it for public bids. Most significantly, Attlin does not suggest that if Muncie Schools had contracted with an architect or engineer by means of a standard professional contract to perform the construction manager's duties, such a contract would have been subject to the public bidding statute. (IC 5–16–1–1). Thus, Attlin implicitly agrees that an architect's or engineer's contract specifying duties the same as appear in the construction manager's contract contested herein would not have been subject to IC 5–16–1–1.

Remaining is Attlin's sole contention that Muncie Schools' power to employ architects and engineers pursuant to IC 20–5–2–2 does not create an exception to IC 5–16–1–1 allowing it to enter into a *construction manager contract* without submitting such a contract for public bids. This contention presents an issue of first impression in Indiana.

As a general rule, contracts for personal or professional services entered into by a public body with a private organization or individual are not governed by public competitive bidding laws and need not be submitted for public competitive bids. Annot., 15 A.L.R.3d 733 (1967). Applying this general rule to public works contracts, its rationale is that competitive bidding laws are applicable to public works construction contracts only where the material and work must conform to specifications allowing the performance of the contract to be measured by relatively objective standards. Consequently, it is presumed that the legislature intended the lowest price to be the ultimate determining factor in awarding the contract. However, with public contracts calling for professional and/or personal services requiring aesthetic, business or technical judgment, and/or professional or scientific skills and experiences, it is assumed that the legislature could not have intended the lowest price to be the ultimate determining factor as the performance of the contract can not be evaluated objectively.[6] Because the nature of personal and/or professional service contracts makes it unlikely that bids would provide any advantage to the public body in awarding the contract, advertising for such bids would be undesirable, impossible or impractical. *Kennedy v. Ross, supra; Graydon v. Pasadena Redevelopment Agency*, (1980) 104 Cal.App.3d 631, 164 Cal.Rptr. 56. In accordance with the foregoing general rule, numerous jurisdictions have applied it to professional and/or personal service contracts with engineers,[7] construction

6. *Waste Management, Inc. v. Wisconsin Solid Waste Recycling Authority*, (1967) 84 Wis.2d 462, 267 N.W.2d 659; *Kennedy v. Ross*, (1946) 28 Cal.2d 569, 170 P.2d 904; *Barnard v. Kandiyohi Cty.*, (1942) 213 Minn. 100, 5 N.W.2d 317; *Flottum v. City of Cumberland*, (1940) 234 Wis. 654, 291 N.W. 777; *Krohnberg v. Pass*, (1932) 187 Minn. 73, 244 N.W. 329; *Hibbs v. Arensberg*, (1923) 276 Pa. 24, 119 A. 727; *Leonardis v. Bunnell*, (1977) 147 N.J.Super. 417, 371 A.2d 365; *Gulf Bitulithic Co. v. Nueces*

*Cty.*, (1928) Tex.Com.App., 11 S.W.2d 305; *Franklin v. Horton*, (1922) 97 N.J.L. 25, 116 A. 176, *aff'd. Franklin v. City of Millville*, (1922) 98 N.J.L. 262, 119 A. 29; *Vermeule v. City of Corning*, (1919) 186 App.Div. 206, 174 N.Y.S. 220, *aff'd.* (1920) 230 N.Y. 585, 130 N.E. 903.

7. *City of Hazard v. Salyer*, (1949) 311 Ky. 667, 224 S.W.2d 420 (contract with an engineering firm to prepare and submit preliminary plans and estimates for improving the city's water works system and erecting a municipal gym

superintendents,[8] construction inspectors,[9] and architects.[10]

In *Cress v. State* (1926), 198 Ind. 323, 152 N.E. 822, the township advisory board for the Ervin School Township gave notice by publication and posting of its intent to issue bonds to pay for: 1) the purchase of a school site; 2) the construction of a school house; 3) an architect; and 4) other necessary expenses related to construction. The Board authorized issuance of bonds totaling $95,000 and employed an architect. Shortly thereafter, a taxpayer sued to enjoin construction of the building and issuance of the bonds but lost his law suit. However, after a change in the officers on the board, the *township officers refused to issue the bonds.*

In deciding the primary issue on appeal (whether township officers possessed the discretionary power to abandon a project approved by their predecessors), the Court considered the authority of the board to contract with the architect for plans and specifications without submitting that contract to the public competitive bidding laws. To resolve this question the Court examined the competitive bidding law in effect at that time which provided:

"If a trustee finds it necessary to erect a new schoolhouse, he shall procure suitable specifications therefor to be used by the bidders in bidding and in the construction of such house. Section 12071, Burns' 1926; section 9598, Burns' 1914; section 9, c. 105, Acts 1899, pp. 150, 156."

*Cress v. State*, 198 Ind. at 335–36, 152 N.E. at 827. The Court interpreted the statute as not requiring an architect's contract to be submitted to competitive bidding. Although the Indiana Supreme Court did not recite the general rule exempting professional service contracts from public bidding requirements, the holding suggests that the rule is applicable in cases such as the one before us involving construction manager contracts.

■ In examining the applicability of the professional service contract rule to the Jacobs–Maze contract we note two significant facts. First, the contract with the architectural firm of Graham, Love included the provision that Graham, Love had responsibility for supervising the construction of the additions. Second, Jacobs–Maze, the construction manager, was an engineering firm and, in compliance with Ind.Code 25–31–1–18,[11] at least one of its partners (Dale Jacobs) was an engineer licensed in Indiana. With these facts in mind we observe that our licensing statutes, specifically the ones applicable to architects (Ind.Code 25–4–1–

---

with a swimming pool); *Kennedy v. Ross, supra* (contract with an engineer to furnish engineering and architectural plans for a proposed sewage and sludge treatment and disposal plant); *Flottum v. Cumberland, supra* (contract with an engineer to survey and prepare plans and specifications for rebuilding and extending the city's electrical and utility plant); *Krohnberg v. Pass, supra* (contract with an engineer to lay out plans and specifications for the heating, plumbing and other mechanical equipment in constructing a school building); *Franklin v. Horton, supra* (contract with an electrical engineer to prepare plans and specifications for an electrical light distribution system to provide public lighting).

8. *Krohnberg v. Pass, supra* (contract with superintendent of construction to be on the work site daily to see that the plans are carried out with proper materials furnished); *Gulf Bitulithic Co. v. Nueces Cty., supra* (contract with a company to supervise the construction of a Highway built by employees of the county).

9. *Hibbs v. Arensberg, supra* (contract with an inspector to inspect a new building as was being erected on behalf of the school district).

10. *Krohnberg v. Pass, supra* (contract with an architect to furnish preliminary sketches, plans and specifications for construction of a school building); *Cress v. State* (1926), 198 Ind. 323, 152 N.E. 822 (contract with architect to prepare plans and specifications for the construction of a school building).

11. IC 25–31–1–18 provides in pertinent part: "A registration certificate for a professional engineer ... may be issued only to a natural person. No partnership, firm or corporation doing business in the state of Indiana may be engaged in the practice of professional engineering ... unless such practice is carried on under the responsible direction and supervision of a registered professional engineer ... who is a principal of the firm or partnership or officer of the corporation."

29) [12] and engineers (Ind.Code 25–31–1–19),[13] required Muncie Schools to employ either an architect or an engineer to both prepare the plans, specifications and esti-mates *and supervise the construction of the additions.* As the evidence disclosed, both Jacobs–Maze and Graham, Love assigned a full–time representative at the additions to

**12.** IC 25–4–1–29 provides in pertinent part:

"(a) Except as hereinafter otherwise provided, the *state of Indiana,* nor any board, department or agency thereof, *nor any* county, city, town, township, *school corporations* or other political subdivision of this state *shall engage in the construction, alteration or maintenance of any public building or public work involving the practice of architecture for which plans, specifications and estimates have not been prepared, certified and sealed by, and the construction, alteration or maintenance executed under the direct supervision of an architect,* which architect shall be the holder in good standing of a certificate of registration from the board of registration for architects entitling him to practice architecture in this state.

(b) *No official of* this state, nor *any* city, town, county, township or *school corporation* thereof, now or hereafter *charged with the enforcement of any law, ordinance or regulation relating to the construction or alteration of buildings or structures, shall use or accept or approve any plans or specifications that have not been prepared by, or under the supervision of, and certified by a registered architect*: Provided, That *the provisions of this subsection shall not apply* if such plans or specifications have been prepared by, or *under the supervision of and certified by a professional engineer who is registered under the laws of the state of Indiana*: . . . ." (Emphasis added).

An architect is a person conducting "the practice of architecture" who is registered by the State of Indiana as such pursuant to Ind. Code 25–4–1–1. "The practice of architecture" is defined as:

". . . the performance of professional services embracing the safe, healthful, scientific, aesthetic or orderly coordination of the planning, designing, erection, alteration or enlargement of any public or private buildings, structure or structures, project or projects, or any part thereof, or the equipment or utilities thereof or the accessories thereto, when such professional services require the application of the art and science of construction based upon the principles of mathematics, aesthetics, or the physical science acquired by education or training, and when such services are performed through the media of consultation, evaluation, investigation, preliminary study, plans, specifications, contract documents, or supervision of construction. Any one, or any combination of the foregoing services by a person shall constitute the practice of architecture. . . ."

**13.** IC 25–31–1–19 provides in pertinent part:

"(a) Except as hereinafter otherwise provided, *no* county, city, town, township, *school corporation* or other political subdivision of this state *shall engage in the construction or maintenance of any public work involving the practice of engineering for which plans, specifications and estimates have not been prepared, certified and sealed by, and the construction and maintenance executed under the direct supervision of, a professional engineer.* Any contract executed in violation of this section shall be null and void.

\*    \*    \*    \*    \*    \*

(c) *No official* of this state, or of *any* city, town, county, township or *school corporation thereof,* now or hereafter *charged with the enforcement of any law, ordinance or regulation relating to the construction or alteration of buildings or structures, shall use or accept or approve any plans or specifications that have not been prepared by, or under the supervision of and certified by, a registered professional engineer:* Provided, That *the provisions of this subsection shall not apply if such plans, or specifications have been prepared by, or under the supervision of and certified by, an architect who is registered under the laws of the state of Indiana*: . . . ." (Emphasis added.)

\*    \*    \*    \*    \*    \*

Ind.Code 25–31–1–19(c) also provides that alterations of public buildings costing less than $10,000 are exempt from the provisions of IC 25–31–1–19. The additions by Muncie Schools totalled approximately $3,000,000.

An engineer is a person conducting the "practice of engineering" who is registered by the State of Indiana as such pursuant to Ind. Code 25–31–1–2(b). The "practice of engineering" is defined as meaning:

". . . any professional service, or creative work, requiring engineering education, training, and experience, and requiring the application of special knowledge of the mathematical, physical, and engineering sciences to such professional services, or creative work, such as consultation, investigation, evaluation, planning, design, and supervision of construction for the purpose of assuring compliance with specification and designs, in connection with any public or private utilities, structures, buildings, machines, equipment, processes, works, or projects. The term 'practice of engineering' shall not include the work ordinarily performed by persons who operate or maintain machinery or equipment."

*Id.* at 25–31–1–2(d).

carry out their contractual responsibilities. Both representatives were designated "field engineers" even though they were not licensed as an architect or engineer. Although the contract with Jacobs–Maze was stylized a "construction management contract," careful examination of its provisions does not reveal any duties or responsibilities which would not otherwise be required of a licensed engineer. Thus, in substance, Muncie Schools hired an engineer to perform engineering duties (the authority for which is specifically set out at IC 20–5–2–2(7)) while only the form of the contract designated the engineer as a "construction manager." By employing both an architect and an engineer Muncie Schools doubly satisfied the statutory requirements for supervision of the construction.

Even had Jacobs–Maze not been an engineering firm with a licensed engineer as one of its partners (or an architectural firm owned by licensed architects), we would still reject Attlin's contention that IC 20–5–2–2(7) does not exempt construction manager contracts from our public bidding laws in light of the fact that Muncie Schools employed Graham, Love as the architect responsible for supervising the construction. Its responsibilities included being the final interpreter of any contractual language involving the projects' contractors, in addition to possessing final approval of shop drawings and design change orders, acceptance of work and certification of work completion. A comparison of Graham, Love's contract with Jacobs–Maze's contract demonstrates Graham, Love had supervisory authority over the contractors *and* Jacobs–Maze as noted in footnote 4, *supra*. We again observe that subsection 7 of IC 20–5–2–2 specifically empowers a school board to employ certain named professionals, including engineers, architects and school personnel. Admittedly, this same statute is silent on construction manager contracts. However, subsection 7 supplies a school board with the power to contract for ... "such other personnel or services, all as the governing board considers necessary for school purposes; ...." Furthermore, subsection 19 allows the school board to make any

expenditure "which is reasonable from a business or educational standpoint in carrying out school purposes of the school corporation; including but not limited to the ... contracting for services even though such power or expenditure shall not be specifically set out herein; ...."

Jacobs–Maze was required to perform services similar to that of an architect or engineer so as to make the contract insusceptible to an objective evaluation. It had extensive duties of an engineering nature in two phases: (1) the design phase; and (2) the construction phase. It was Jacobs–Maze's responsibility to bring together all the construction projects at both additions by coordinating the solicitation and acceptance of bids for the various projects at each addition during the design phase and by sharing with the architect the general supervision of the work performed in the construction phase. The actual construction was not to be performed by Jacobs–Maze. It was employed to utilize its professional engineering skills and experiences as insurance that both additions would be timely completed. Significantly, it did not guarantee that the total cost of each addition would be at or below the total value of the bids. It was not a general contractor; rather, its actions and decisions were subject to the supervision and approval of Graham, Love.

We do not believe the Legislature contemplated that our bidding statute would govern contracts for professional services like the one before us which provide for the performance of duties similar to those of an architect or engineer and are entered into under IC 20–5–2–2(7), (19). These contracts are not susceptible to objective evaluation of their performance so as to make the price the ultimate determining factor. Furthermore, the nature of such contracts makes advertisement for bids impractical and undesirable. Where, as here, a contract requires the construction manager to perform duties similar to that of an architect or engineer, the rationale for exempting the architect or engineer's contract from the bidding laws is equally applicable to the

construction manager's contract. *See Cress v. State, supra.*

Our comments in this regard are supported by the decision in *Mongiovi v. Doerner* (1976), 24 Or.App. 639, 546 P.2d 1110, where the court held a contract between Douglas County and a construction manager to supervise the solicitation and acceptance of bids on a construction project was exempt from the Oregon bidding law. The court in *Mongiovi* observed that the construction manager's position was necessary since there was to be no general contractor on the construction of the county courthouse as the county adopted the "fast track" construction method (similar to the one employed by Muncie Schools); therefore there was no one to synchronize all the work. The construction manager performed this service "by coordinating the solicitation and acceptance of bids for various parts on the construction project, and by sharing with the architect general supervisory authority over the work performed." *Id.*, 240 Or.App. at 644; 546 P.2d at 1113. He did not perform any construction work on the courthouse nor did he supply any of the materials. Instead, the county purchased his professional services involving peculiar skills, knowledge and expertise. Consequently, the court held that because his contract involved professional and personal services, which could be evaluated solely by subjective criteria, it was not subject to the Oregon competitive bidding laws.

Attlin places heavy reliance upon the case of *City of Inglewood—Los Angeles Cty. Civic Center Auth. v. Superior Court,* (1980) 7 Cal.3d 861, 103 Cal.Rptr. 689, 500 P.2d 601, where the California Supreme Court concluded that the construction management contract was invalid since it had not been let for bids pursuant to California's competitive bidding law. The challenged contract involved the management of the construction of civic center buildings owned by the Los Angeles County Civic Center Authority and provided generally that the management contractor was to supply services and to lend experience in the preparation of the final plan. However, controlling the California Supreme Court's decision was a consideration of one specific responsibility not present in Jacobs–Maze's contract. The management contractor guaranteed the outside (maximum) price for the project based upon the sub–contractor's bids thereby making the contract more closely akin to the traditional lump sum general construction contract rather than to a contract for the services of an engineer or an architect. Consequently, the management contract could be evaluated by objective criteria making the price the ultimate determining factor. An examination of the Jacobs–Maze contract makes it apparent that it has the characteristics of the *Mongiovi* professional service contract rather than the general contractor agreement in *City of Inglewood.*

For the reasons stated above we affirm the trial court's judgment.

CHIPMAN, J., concurs.

YOUNG, P. J., dissents with opinion.

YOUNG, Presiding Judge, dissenting.

I dissent.

The majority opinion ignores the threshold question presented in this appeal. That is whether the school corporation can legally enter into a contract with a construction manager. I would hold such a contract is invalid because of the absence of statutory authority in the school corporation. *State v. Meiser,* (1929) 201 Ind. 337, 168 N.E. 185. School corporations are creatures of the General Assembly and only possess such power as is expressly given them or such power as may be implied from the power given. *State v. School City of Anderson,* (1957) 236 Ind. 649, 142 N.E.2d 914.

The persons which school corporations may contract with for services are spelled out in the following statute:

"In carrying out the school purposes of each school corporation, its governing body acting on its behalf shall have the following specific powers:

(7) To employ, contract for and discharge superintendents, supervisors, prin-

cipals, teachers, librarians, business managers, superintendents of buildings and grounds, janitors, engineers, architects, physicians, dentists, nurses, accountants, teacher aides performing noninstructional duties, educational and other professional consultants, data processing and computer service for school purposes, including but not limited to the making of schedules, the keeping and analyzing of grades and other student data, the keeping and preparing of warrants, pay–roll, and similar data where approved by the state board of accounts as provided below, and such other personnel or services, all as the governing body considers necessary for school purposes; to fix and pay the salaries and compensation of such persons and such services; to classify such persons or services and to adopt schedules of salaries or compensation; to determine the number of such persons or the amount of services thus employed or contracted for; and to determine the nature and extent of their duties."

I.C. 20–5–2–2(7).

"Construction managers" are not named and neither may such be implied. Thus the school corporation may not employ one or contract with one. Had the General Assembly wished to grant school corporations the power to contract for such services it could easily have done so. The omission is indicative of its desire not to do so.

The General Assembly's intent regarding authorization to hire a project consultant/construction manager is exhibited by attempts to pass just such legislation. In 1979 Senate Bill 245 was introduced and would have amended Ind.Code 5–16–1–1 to allow hiring of project consultants for public buildings thereby including a project consultant as one who could be hired under Ind.Code 20–5–2–2(7). S.B. 245, 101st General Assembly 1st Sess. (1979). The amendment would permit the hiring of such a consultant and such hiring may be without submission of bids. The bill defined a

"project consultant" as one employed to advise on and consider the budget and cost prior to commencement of construction as well as manage construction. The bill would not prevent the architect or engineer acting on behalf of the local entity to ensure compliance with the contract. The General Assembly, in proposing such an amendment, must not have believed the previously enacted statutes included such authorization. The failure of this bill as well as others, see e. g. H.B. 1217, 101st General Assembly 2d Sess. (1980) and H.B. 1246, 100th General Assembly 2d Sess. (1978), to become law also is some indication that the General Assembly does not yet intend to permit such hiring in the public works projects of this state. Even aside from this negative indication, the General Assembly's recent and continuing consideration of this issue is sufficient reason to restrain from judicially enlarging the power given school corporations.

Analysis of I.C. 5–16–1–1, the public bidding statute, lends support to this dissent. By approving the use of a "construction manager" the majority obviates the statutory scheme for the construction of buildings by school corporations.

School corporations are authorized to construct school buildings by awarding a contract to the person with the lowest and best bid. The school corporation and the public are thereby assured that one person will be bound to construct the building for a sum certain, performance being guaranteed by a bond in the amount of the contract. I.C. 20–2–9–1 and I.C. 5–16–1–1. It is contemplated that the building will be completed by one person who contracts to do so rather than a number of separate tradesmen performing separate tasks such as plumbing, masonry, electrical work, etc. It is a "turnkey" project. The method approved here will not ensure completion of any project. Neither will it ensure completion at a specified contract price.[1] School corporations are not authorized to act as their own gen-

---

1. The majority states that money is saved the school corporation by use of the construction manager. However, under the terms of the contract, the fee to be paid the construction manager is not fixed, but rather, is a percentage of each construction bid awarded.

eral contractor in such projects but must contract with others to do so.